289 N.W.2d 426 (1979)
MINNESOTA VIKINGS FOOTBALL CLUB, INC., and Michael E. Lynn, III, Respondent, and
The City of Minneapolis, intervenor, Respondent,
v.
METROPOLITAN COUNCIL, Respondent,
Piper, Jaffrey & Hopwood, Inc., Respondent,
Nicholas D. Coleman, et al., Petitioner,
Metropolitan Sports Facilities Commission, Respondent.
No. 50599.
Supreme Court of Minnesota.
October 19, 1979.
*427 Rosen & Ballenthin, St. Paul, for Coleman et al.
Hyman Edelman and William Z. Pentelovitch, Minneapolis, for Minn. Vikings Football Club, Inc., et al.
Jerome R. Jallo, Minneapolis, for The City of Minneapolis.
Briggs & Morgan, St. Paul, for Metropolitan Council.
Faegre & Benson, Minneapolis, for Piper, Jaffrey & Hopwood, Inc.
Wayne H. Olson, Minneapolis, for Metropolitan Sports Facilities Commn.
Heard, considered, and decided by the court en banc.

OPINION
SHERAN, Chief Justice.
On May 21, 1979, the legislature of the State of Minnesota concluded many years of legislative debate about the construction of a domed stadium in the Twin Cities Metropolitan area by its action amending the 1977 Metropolitan Sports Facility Act codified at Minn.Stat. §§ 473.551 to 473.595 (1978). 1979 Minn. Laws, ch. 203, §§ 1-16, effective May 26, 1979.
Earlier legislation had repealed the 2% metropolitan area liquor tax, 1979 Minn. Laws, ch. 26, and the later legislation primarily directed the Metropolitan Council (hereafter "council") to make 14 separate determinations prior to the issuance of its bonds and the commencement of construction. 1979 Minn. Laws, ch. 203, § 8.
This comprehensive legislation also included a provision concerning possible court challenges, which is unique in the legislative history of this state. 1979 Minn. Laws, ch. 203, § 15, coded at Minn.Stat. § 473.597 provides as follows:
Pursuant to article VI, section 2 of the Minnesota constitution the supreme court shall have original jurisdiction of any action brought or maintained in which an issue is presented as to the validity of a provision of [1979 Minn. Laws, ch. 203, *428 §§ 1 to 14], and may hear and determine the issue as provided in title V of the rules of civil appellate procedure, after notice is given as provided in rule 144.
This section illuminates the intent of the legislature to secure a prompt judicial resolution of legal proceedings which might otherwise complicate or protract the construction of a stadium. Since the enactment of this law, extensive preparations have been made by the designated agencies, municipal corporations and other interested parties to comply with its preliminary terms prior to letting the construction contracts and issuing the bonds to raise the necessary revenue. These efforts have precipitated three lawsuits which have reached this court for final review.
The first of these, Eakman v. Brutger, 285 N.W.2d 95 (Minn.1979) involved an order of the Hennepin County District Court denying plaintiffs' motion for a temporary restraining order enjoining "any further action toward the building of a domed stadium in Down Town Minneapolis" and granting defendants' motion to dismiss the complaint. The order was affirmed upon the bases both that plaintiffs had failed to establish that there was a genuine issue of material fact and that they had inappropriately attempted to raise on appeal issues not presented to the trial court.
Additionally, two separate lawsuits were commenced in the Hennepin and Ramsey County District Courts. The first of these was commenced in Hennepin County by the service of the summons and complaint on August 29, 1979. The plaintiffs therein, the Minnesota Vikings Football Club, Inc., and Michael E. Lynn, III, sought a declaratory judgment against defendants council and Piper, Jaffrey and Hopwood that the detailed determinations required of the Metropolitan Sports Facilities Commission (hereafter "commission") and the council by Minn.Stat. § 473.581, subd. 3 (1978) had been validly and lawfully made.
The second of these two lawsuits was commenced in the Ramsey County District Court by plaintiffs Nicholas D. Coleman, Robert O. Ashbach and Robert E. Short, et al against the defendants council and commission on August 30, 1979. These plaintiffs primarily contended that the proposal submitted by the commission to the council was statutorily insufficient, citing numerous grounds; that the determination of the council as delineated in § 473.581, subd. 3(a) to (n) were void as based upon the invalid determinations of the commission; and that § 473.597, placing original jurisdiction of any legal action in the supreme court, is unconstitutional. The plaintiffs thereby essentially sought to enjoin action in furtherance of the construction project because of the alleged failures of the legislatively created agencies to comply with the legislatively prescribed preconditions to construction and bond issuance.
An analysis of the pleadings filed in each case indicates that, without regard to the specific constitutional issues, the basic questions presented for decision in each were substantially similar and that the conduct of two similar lawsuits simultaneously in separate jurisdictions would be subversive to the interests of justice. In response to this problem, counsel for all parties entered into an agreement on August 31, 1979 in open court providing substantially as follows 
1. that the actions would be consolidated;
2. that trial would be held in the Ramsey County District Court;
3. that a district judge not chambered in the metropolitan area would be designated to preside by the Chief Justice of the Minnesota Supreme Court;
4. that the parties would confer with the presiding judge not later than September 6, 1979; and
5. that the trial on the merits would commence on September 10, 1979 and proceed with dispatch.
*429 An additional and focal provision of the agreement of all counsel, made in the presence of and with the acquiescence of their clients, stated as follows:
6. If there is a decision by the trial court which the plaintiffs in this case deem to be adverse to them, the plaintiffs agree to limit themselves to a period of three business days following receipt of a copy of the decision of the trial judge by counsel for the plaintiffs within which the plaintiffs will decide whether they will take an appeal from the decision of the trial court. And if plaintiffs decide not to appeal, the plaintiffs will promptly and within such three day period formally waive their right to appeal, the purpose and intent being that the plaintiffs so doing will obviate any uncertainties that might be created by the time periods otherwise provided in the law running following a trial court decision.
Plaintiffs Coleman, Ashbach and Short, et al conditioned their agreement to limit their time to appeal upon agreement by the council and the commission that they would not appeal except upon the vote of a majority of the members of those bodies taken at a duly called meeting at which plaintiffs could appear and be heard.
Mr. William S. Rosen, plaintiffs' counsel, was reminded that he had agreed to 3 days, not 3 business days, and accordingly modified the stipulation. He stated, on the record, that it was his understanding that plaintiffs would have to file a notice of appeal within the 3-day period. Again the record indicates that this expressed understanding was made in open court in the presence of and with the acquiescence of the plaintiffs Coleman, Ashbach and Short, et al.
At this time, the district court also considered the motion of defendant council that the plaintiffs be required to furnish a surety bond as required by Minn.Stat. § 562.02 (1978) of plaintiffs questioning the action of a public body. The court, in the exercise of its discretion, denied the motion, presumably taking into consideration the parties' agreement to expedite the action and appeal, if any.
Counsel for all parties met and conferred with the Chief Justice of the Minnesota Supreme Court on September 3, 1979. Two of the parties, Nicholas D. Coleman and Robert E. Short, were also in attendance. It was agreed that the Honorable Warren A. Saetre, Judge of the District Court for the Ninth Judicial District, would be designated to preside at the trial on the merits in conformity with the time limitations reflected in the parties' agreement. The parties expressed disagreement as to whether the supreme court should be simultaneously provided with all documents filed in the district court.
By order of this court filed on September 4, 1979, the actions were consolidated for trial and Judge Saetre was appointed to preside. Thereafter, on September 6, 1979, this court denied the request that all briefs and other materials filed in the district court be simultaneously filed in this court. The order is attached hereto as Appendix A. At that time, the decision was motivated in part by the assurances made by the attorneys for the parties that an appeal would be taken expeditiously from any final decision of the district court, rendering contemporaneous filings unnecessary.
The files and records of this matter disclose that the trial in the district court was conducted within the time limitations requested by the parties. During the course of these proceedings, counsel for the plaintiffs Coleman, Ashbach and Short, et al reiterated the fact that the trial had been expedited at their request.
The decision of the Ramsey County District Court was filed on September 24, 1979 with the clerk of the district court and the parties were notified on that same date. The decision is attached hereto and incorporated herein as Appendix B. No appeal has ever been taken by any person, organization or agency.
On September 28, 1979, the attorneys for the Metropolitan Council, Minnesota Vikings *430 Football Club, Metropolitan Sports Facilities Commission and the City of Minneapolis filed with this court a motion for an order determining that the right of Coleman, Ashbach and Short, et al to appeal from the decision of the district court had expired on September 27, 1979 pursuant to the prior agreement of the parties to expedite any appeal. The plaintiffs opposed this motion and instead sought an order denying the motion on jurisdictional grounds.
At the request of the parties, several preliminary conferences were held, including a meeting of all counsel with the special term panel of this court on September 28, 1979. The following issues were then designated for hearing:
1. Whether the supreme court has jurisdiction to consider the motion of the Metropolitan Council, et al to determine that the time for appeal by Coleman, Ashbach and Short, et al had expired 3 days after the decision was filed, as agreed by the parties; and
2. Whether, if the supreme court does have jurisdiction, the attorney for plaintiffs Coleman, Ashbach and Short, et al made a binding commitment that the appeal would be taken within 3 days of the filing of the district court decision or not at all.
It was anticipated that counsel for the parties would discuss the effect of 1979 Minn. Laws, ch. 203, § 15; Minn.Stat. § 473.597, the legislative attempt to confer original jurisdiction upon the supreme court. However, it was specifically understood and agreed that the merits of the district court decision would not be argued or considered until the jurisdictional questions regarding the agreement to limit the time for appeal had first been decided.
Subsequent to the extensive en banc oral argument held before this court on October 4, 1979, an order was filed, attached hereto as Appendix C. The parties were immediately informed of its contents at the time the order was filed. The members of this court are of one mind in concluding that the court had jurisdiction to consider the motion to determine that the time to appeal had expired, and, further, that the parties had deliberately and voluntarily agreed to limit the time to appeal.
While the motion filed on behalf of the council, et al does not precisely fall within the categories of appellate review contained in Rules 103.03 and 105, R.Civ. App.P., we conclude that it is within the inherent power of the court to determine the scope of its jurisdiction, particularly when a case is of pressing concern to the public or to the litigants. For example, Rule 102, R.Civ.App.P., authorizes this court to suspend certain rules and requirements "[i]n the interest of expediting decision upon any matter before it, or for other good cause shown" and other provisions of the Rules of Civil Appellate Procedure are directed toward a furtherance of the interests of justice.
To hold that this court is without jurisdiction to consider the council, et al's motion would, in practical effect, allow a party attempting to repudiate or avoid stipulated time limitations for appeal to accomplish that goal by inaction, regardless of any effect upon the opposing parties.
The second issue considered by the court was whether the agreement entered into by the parties was binding. This court has held in the past that the right to appeal is a privilege which may be waived by the agreement of the parties. State v. Sawyer, 43 Minn. 202, 45 N.W. 155 (1890); Krieg v. Bofferding, 140 Minn. 512, 167 N.W. 1047 (1918); and see generally 4 Am.Jur.2d Appeal and Error § 236 (1962).
The fact that the attorney for Coleman, Ashbach and Short, et al agreed and represented to the court that an appeal from the decision of the district court would be taken within 3 days of its filing or not at all is established beyond reasonable argument by reference to the transcript of Mr. Rosen's statements to the court.
*431 At the time of the oral argument before this court on October 4, 1979, Mr. Rosen contended that the plaintiffs should not be held to this agreement because it was not supported by consideration of a kind which would make a contract between private parties binding. However, it is our view that an oral representation to the court made by an attorney in the course of litigation is a solemn obligation which must be fulfilled without regard to whether it satisfies the strict requirements of commercial contracts. It would be impossible for a court system to function if the representations of attorneys, particularly in the presence of and with the acquiescence of their clients, could not be relied upon. This is particularly true in the present case where major economic decisions involving a significant number of persons and substantial sums of money were held in suspense by the pendency of legal proceedings awaiting final resolution.
Therefore, our determination that the time for appeal by Coleman, Ashbach and Short, et al had expired according to the terms of their agreement was inescapable.
The court nevertheless was of the view that in extraordinary cases parties should have the opportunity to seek relief from a stipulation if the interests of justice so require. As in the case of a party's attempt to vacate a default judgment, such relief cannot normally be given without causing significant and irreversible harm to others. It was considered reasonable, therefore that Coleman, Ashbach and Short, et al, who had permitted their time to appeal to expire, be allowed to apply to this court for this extraordinary relief.
The order of this court filed on October 4, 1979 therefore authorized those parties to apply for relief from their waiver of normal appeal period set forth in Rule 104.01, R.Civ.App.P., and directed that such relief could be predicated upon a substantial showing 
(a) that such relief can be accorded without prejudice or damages to other persons affected by the pendency of these proceedings; and
(b) that, if relief from the said waiver is granted, they have a reasonable prospect of prevailing in the event that a review of the decision of the Honorable Warren A. Saetre is accorded.
These requirements are substantially similar to those set forth as necessary to support a motion to vacate a default judgment. Hinz v. Northland Milk and Ice Cream Co., 237 Minn. 28, 53 N.W.2d 454 (1952).
The court at that time considered the possibilities that a supersedeas bond in some amount might be required as security for damages if the appeal were allowed and found to be groundless or that a briefing and argument schedule might have to be proposed which would make a decision possible in a period of time to which the affected parties could accommodate. However, those potential alternatives could not be explored by this court without some assurance from the parties seeking relief from their waiver that a reasonable basis existed for their appeal.
A time was fixed for filing this application for extraordinary relief and a time for argument scheduled to allow the parties to orally discuss their application.
No application for relief was or has been filed and no appearances were made at the time designated in the October 4, 1979 order. No request for reconsideration or modification of that order has been received. No formal explanation of the parties' decision to not seek relief has been submitted to this court.
No appeal having been taken from the decision of the Ramsey County District Court within the time specified by the agreement of the attorneys made in open court in the presence of and with the acquiescence of their clients, no request for relief from the stipulated shortened time for appeal having been filed and no motion for reconsideration or modification of the order of October 4, 1979 having been submitted, the decision of the district court filed on September 24, 1979 becomes the law of the case.

*432 APPENDIX A

STATE OF MINNESOTA IN SUPREME COURT FILE NO. 50559
Nicholas D. Coleman, Robert O.
Ashbach, Robert E. Short, Benson
Hotel Corporation, a Minnesota
Corporation d.b.a. Hotel Leamington,
Leamington Motor Inn, Inc., a
Minnesota Corporation and Leamington
Motor Inn, Inc. d.b.a. Francis
Drake Hotel,
 Plaintiffs,
vs.
Metropolitan Council and
Metropolitan Sports Facilities
Commission,
 Defendants.
-AND-
Minnesota Vikings Football Club,
Inc. and Michael E. Lynn III,
 Plaintiffs,
vs.
The Metropolitan Council and Piper,
Jaffray and Hopwood, Inc.,
 Defendants.

ORDER
For the reasons stated in the attached Memorandum the request that briefs and other materials filed in the proceedings to be conducted in the District Court for Ramsey County before the Honorable Warren A. Saetre be simultaneously filed with the Minnesota Supreme Court is denied.
DATED: September 6, 1979.
 BY THE COURT
 (s) Robert J. Sheran 
 Robert J. Sheran, Chief Justice

MEMORANDUM
During the course of proceedings before the undersigned in the chambers of the Minnesota Supreme Court at the State Capitol on Monday, September 3, 1979, it was proposed that briefs and other materials to be filed in the proceedings pending in the District Court for Ramsey County, the Honorable Warren A. Saetre presiding, should be simultaneously filed with the Minnesota Supreme Court in anticipation of an appeal.
The rationale in support of this request included these claims and assertions:
1. Early resolution of the issues involved in the litigation pending in the District Court is imperative.
2. Although the Honorable Warren A. Saetre, Judge of the District Court of the State of Minnesota, has been assigned, at the request of the parties, to commence the trial of this case on September 10, 1979, it is possible that one or more of the parties to this litigation will appeal such decision as the Honorable Warren A. Saetre may make to the Supreme Court.
3. Resolution of such an appeal, if taken, would be expedited if the materials to be presented to and considered by the Honorable Warren A. Saetre were made available simultaneously to the Minnesota Supreme Court.
No instance has been called to our attention and we are aware of none where this procedure has been employed.
Article VI, § 2 of the Minnesota Constitution provides that the Minnesota Supreme Court "shall have original jurisdiction in such remedial cases as are prescribed by law, and appellate jurisdiction in all cases, * * *." Article VI, § 3 of the Minnesota Constitution provides that the district court shall have original jurisdiction in all civil and criminal cases. From this it follows that by the terms of the Constitution, the trial of the issues involved in the pending litigation must precede consideration by this court unless it could be said that the pending actions constitute "remedial cases" prescribed by law within the meaning of Article VI, § 2.
Remedial cases in which the Legislature is authorized to confer original jurisdiction on the Supreme Court include only those cases in which the remedy is afforded summarily through such extraordinary writs as mandamus, quo warranto, or habeas corpus. In re Lauritsen, 99 Minn. 313, 109 N.W. 404 (1906).
It appears that some, and perhaps all, of the issues pending in the district court must be tried there initially in exercise of the original jurisdiction placed in the trial court by the terms of the Constitution. Apart from this, the Minnesota Supreme Court *433 does not have the facilities to hear witnesses or record and transcribe their testimony.
The Judge of the District Court assigned to the trial of this case has acceded to the time schedule specified by the parties. He will meet and confer with their attorneys on September 6, 1979 and commence the trial on September 10, 1979. It is assumed that the evidence relevant to the cases will be submitted expeditiously either by stipulation or through witnesses and that the decision of the trial court with respect to these issues will be filed as promptly as circumstances permit. It would be inappropriate for the Minnesota Supreme Court to intrude upon this process either by fixing time limitations for decision by the trial court or by undertaking a review of the trial court's decision before it is made. We must assume that the parties will accept the decision of the trial court with respect to this matter, at least until it has been filed and analyzed by the litigants. It would be unwise as well as unprecedented for this court to involve itself in a review of the proceedings before the trial court while the case is going on.
We cannot and do not assume that an appeal will be taken by any party for the purposes of delay. We recognize the possibility that one or more of the litigants may, in good faith, seek appellate review in this court. When and if that occurs, the matter will be given prompt and expeditious attention. It is to be assumed that the experienced counsel involved in this litigation will be able, in such event, to file an adequate record of the trial court proceedings including a transcript of the testimony, copies of the exhibits and relevant briefs without significant delay. We can see no real advantage in having any of the materials bearing on the trial in the district court submitted to or considered by the Minnesota Supreme Court unless and until our jurisdiction is properly invoked by the filing of an appeal.
 (s) Robert J. Sheran 
 Robert J. Sheran, Chief Justice

APPENDIX B
STATE OF MINNESOTA IN DISTRICT COURT
COUNTY OF RAMSEY SECOND JUDICIAL
 DISTRICT
 438136, 438198
Minnesota Vikings Football Club, Inc.
and Michael E. Lynn III,
 Plaintiffs,
 AND
The City of Minneapolis,
 Intervenor,
 -VS-
Metropolitan Council and Piper,
Jaffray & Hopwood, Inc.,
Nicholas B. Coleman and Robert
O. Ashbach, Robert E. Short, Benson
Hotel Corporation, a Minnesota
Corporation d/b/a Hotel Leamington,
Leamington Motor Inn, Inc., a
Minnesota Corporation and Leamington
Motor Inn, Inc., d/b/a Francis
Drake Hotel,
 Defendants.
Nicholas D. Coleman, Robert O. Ashbach,
Robert E. Short, Benson Hotel
Corporation, a Minnesota Corporation,
d/b/a Hotel Leamington, Leamington
Motor Inn, Inc., a Minnesota
Corporation and Leamington Motor Inn,
Inc., d/b/a Francis Drake Hotel,
 Plaintiffs,
 -VS-
Metropolitan Council and Metropolitan
Sports Facilities Commission,
 Defendants,
 AND
The City of Minneapolis, Minnesota
Vikings Football Club, Inc., and
Michael E. Lynn III,
 Intervenors.

FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT
The above entitled matter came on for trial in the District Courtroom for Ramsey County, St. Paul, Minnesota on the 10th day of September, 1979, without a jury, pursuant to the Order of the Supreme Court and agreement of counsel, the undersigned having been assigned by the Supreme Court to attend the trial hereof and discharge the duties as a Judge of the District Court of the Second and Fourth Judicial Districts and as a Referee appointed by the Supreme *434 Court to make findings concerning constitutional issues, all as provided for in the Order of the Supreme Court dated September 4, 1979.
The following counsel were in attendance at the trial:
Minnesota Vikings Football Mr. Hyman Edelman and
Club, Inc. and Mr. William C. Pentelovitch,
Michael E. Lynn III. Minneapolis.
City of Minneapolis. Mr. Jerome R. Jallo,
 Assistant City Attorney,
 Minneapolis.
Metropolitan Council. Mr. B. C. Hart,
 Mr. David C. Forsberg,
 Mr. Peter W. Sidkins,
 Mr. Peter H. Seed,
 Mr. John T. Hoeft,
 St. Paul.
Nicholas B. Coleman and Mr. E. S. Rosen,
Robert O. Ashbach, Robert St. Paul.
E. Short, Benson Hotel Mr. Brian P. Short,
Corporation, d/b/a Minneapolis.
Hotel Leamington, Leamington
Motor Inn, Inc.,
and Leamington Motor,
Inc., d/b/a Francis
Drake Hotel.
Metropolitan Sports Facilities Mr. Wayne H. Olson,
Commission. Mr. David R. Knodell,
 Minneapolis.
Pursuant to the parties' stipulation, the Court dismissed defendant Piper, Jaffrey & Hopwood, Inc. without prejudice and without costs.
The venue in the Hennepin County action entitled Minnesota Vikings Football Club, et al vs. Metropolitan Council, et al was changed to Ramsey County and consolidated for trial with the Nicholas D. Coleman, et al vs. Metropolitan Council, et al actions, both actions being brought under the provisions of the Declaratory Judgments Act, Minnesota Statutes 555.01 for the purpose of obtaining a judicial determination as to the actions of defendant Metropolitan Council and Metropolitan Sports Facilities Commission with respect to the construction of a domed sports facility to be located in the City of Minneapolis. Plaintiffs Minnesota Vikings, Lynn, Metropolitan Council, Metropolitan Sports Facilities Commission and City of Minneapolis all urged the Court to find the actions of the Metropolitan Council to be lawful and proper to the extent that the Council may now issue and sell the bonds in order to construct a covered sports facility in the City of Minneapolis. Plaintiffs Coleman, Short, et al contend and pray for judgment of the Court holding that the defendant Council and Commission have proceeded in violation of the requirements of Minnesota Statute 473.551-473.596 and that the Council's actions are contrary to law, arbitrary, capricious, unreasonable and therefore void.
The Court having heard the testimony of the witnesses and considered all of the evidence, the arguments and briefs of counsel, the entire file herein and being advised in the premises now makes its,

FINDINGS OF FACT
1. That Nicholas D. Coleman (hereinafter called "Coleman") is a resident of and owner of real property in the City of St. Paul, County of Ramsey, a taxpayer, a duly elected member of the Minnesota Senate and Majority Leader of the Minnesota Senate.
2. Robert O. Ashbach (hereinafter called "Ashbach") is a resident of and owner of real property in Ramsey County, Minnesota a taxpayer and the duly elected Minority Leader of the Minnesota Senate.
3. Robert E. Short (hereinafter called "Short") is a resident of Hennepin County, Minnesota, and an owner of real property in the City of Minneapolis, Hennepin County and a taxpayer and the owner of controlling interest in the Benson Hotel Corporation and Leamington Motor Inn, Inc.
4. That the Leamington Hotel, Leamington Motor Inn, Inc. and the Francis Drake Hotel, all located within said City of Minneapolis, owned and controlled by plaintiff Short all hold on sale liquor licenses and do sell retail intoxicating liquors to the public and furnish for consideration lodging in said hotels for periods of less than thirty days.
5. That the defendant Metropolitan Council (hereinafter referred to as "Council") is a political subdivision of the State of Minnesota created by the Legislature of the State of Minnesota pursuant to the provisions of Minnesota Statute 473.123.
6. That defendant Metropolitan Sports Facilities Commission (hereinafter called *435 "Commission") is a public agency created by the Legislature of the State of Minnesota pursuant to the provisions of Minnesota Statute 473.553.
7. That plaintiffs-intervenors-defendants Minnesota Vikings Football Club, Inc., (hereinafter referred to as "Vikings") is a Minnesota Corporation which operates the Minnesota Vikings, a professional football club pursuant to a franchise from the National Football League.
8. That plaintiff-intervenor Michael E. Lynn III is an owner of real property located in Hennepin County and is an officer of said Minnesota Vikings Professional Football Club.
9. That the City of Minneapolis is a political subdivision of the State of Minnesota.
10. That the Legislature of the State of Minnesota enacted a Public Law known as the Metropolitan Sports Facility Act, Minnesota Statute 473.551, et seq. (hereinafter called the "Act") by which Act the Commission was authorized and empowered to select a site, design and construction of a new or remodeled sports facility in the metropolitan area of Minneapolis-St. Paul.
11. That the offices of said Council and Commission are located in the City of St. Paul, Ramsey County, Minnesota.
12. That the Commission is required by Minnesota Statute 473.571, Subd. 6 and 473.572, Subd. 1 to submit proposals to the Council appropriate and necessary for the Council to make determinations as required by Minnesota Statute 473.581, Subd. 3 as amended by Chapter 203, Laws 1979.
13. That the Commission has determined to construct a covered multipurpose sports facility to be located in the City of Minneapolis and has entered into certain contracts and agreements in furtherance of the construction of such facility and has furnished information and data to the Council as required by the Statute for the purpose of the Council to make its determination as required by 473.581, Subd. 3.
14. That the Commission has executed a use agreement (also referred to as "lease") in writing with the Minnesota Twins (hereinafter referred to as the "Twins") a major league professional baseball team located in the State of Minnesota for the use of the proposed domed sports facility for all scheduled regular and playoff games scheduled by said baseball team which use agreement (hereinafter referred to as the "Lease") is for a period of thirty years.
15. That the Twins lease provides among other things that the lease may be terminated upon conditions related and limited to the bankruptcy, insolvency, or financial capability of the organization, including the following:
(A) That if the team is unable to sell an average of the lesser of (a) 1,400,000 tickets or (b) the average number of tickets sold by all teams in the American League during a baseball season for three consecutive baseball seasons, or (2) if for three consecutive team fiscal years the team has a cumulative net operating loss according to the certified audits by the team's certified public accountants for those three years, the team may terminate this agreement . . . upon giving proper notice to the Commission.
(B) During any of the first three baseball seasons the stadium is in use by the team, if the lack of air conditioning substantially adversely affects attendance at home games and thus the team's revenues, the team may give the Commission notice of such effect and if the Commission does not install air conditioning before the commencement of the baseball season next following such notice, subject to the availability of the equipment, the team may terminate this agreement.
16. That the Council has determined that the lease termination provisions relate to the financial capability of the said baseball team and are in compliance with the provision of the Statute 473.581, Subd. 3(a).
17. That the agreement with the Twins further provides that in the event of default the team shall pay the Commission damages as provided for in said Statute.
18. That the Commission has entered into a use agreement with the Minnesota Vikings Football Club (hereinafter referred to as the "Vikings Lease") for the use of the Sports facility to be constructed in the *436 City of Minneapolis for a period of thirty years for all scheduled regular season games, playoff games and for at least one-half of its exhibition games played each season; that said agreement provides for termination upon conditions related and limited to bankruptcy and insolvency and further provides for the payment of damages in the event of default by said Vikings; that said Vikings lease warrants to said Vikings that the Commission has entered into an agreement satisfying the provisions of Minnesota Statute 473.581, Subd. 3(m) and that said Vikings team is free from the prohibition otherwise imposed by Minnesota Statute 473.568.
19. That the terms and conditions of the lease agreements with said Twins and Vikings comply with the provisions of 473.581, Subd. 3(a).
20. That the Commission has executed agreements with the American League of Professional Baseball Clubs and the National Football League, the Major Leagues from whom franchises are held by said Twins and Vikings which agreements have been executed in compliance with the provisions of 473.581, Subdivision 3(b) and which agreements from said major leagues provide the following guarantees for the continuance of franchises in the metropolitan area for the period of time covered by the lease agreements with said Vikings and Twins as follows to-wit:
(A) That the Leagues agree that they will not voluntarily approve the relocation of the league member franchises in violation of the lease agreements of the Vikings and Twins with the Commission for the use of the Commission facilities.
(B) That in the event of voluntary resignation of the Vikings or Twins from the Leagues to which they belong, the Leagues shall for a period of ninety days agree to the assignment of the lease agreement between the Commission and the team or teams for the use of the stadium to an entity which will assume the withdrawing teams' obligations thereunder providing such successor team complies with the League's membership requirements.
21. That the agreement with said major leagues provide for the continuance of franchises in the metropolitan area as contemplated by 473.581, Subd. 3(b).
22. That the Council is authorized by 473.581, Subd. 3 to issue $55,000,000 in revenue bonds for the construction contracts for a domed multipurpose stadium.
23. That the interest earned as money derived from the sale of the bonds are capital funds that may be available to the Commission to construct the sports facility.
24. That the proceeds of the revenue bonds to be issued and sold will be sufficient together with other capital funds that may be available to the Commission to construct the proposed covered multipurpose sports facility.
25. That the provisions of Minnesota Statute 475.56 is in conflict with the provisions of 473.581, Subd. 3; that the Council is limited to the issuance and sale of a maximum of $55,000,000 in revenue bonds.
26. That the City of Minneapolis has agreed with the Council to acquire, clear, relocate and pay all legal costs and expenses and deliver title and possession to all real property including easements and appurtenances needed for the stadium site and adjacent parking thereto.
27. That the Commission has executed agreements with the Minnesota Teamsters Joint Council No. 32, the Minneapolis Building & Construction Trades Council and the Construction Managers that provide that no labor strike or management walkout will halt, delay or impede the construction of the stadium.
28. That the Commission has entered into an agreement with Barton-Malow/Construction Management Services, Inc., a joint venture, wherein a certified maximum price has been agreed to in the sum of $52,400,000 with a certified completion date of April 1, 1982; that the said construction managers are required by said agreement to purchase and provide to the Commission a combined performance bond and payment bond for 100 percent of the certified maximum price to cover costs incurred over and *437 above the certified price as required by 473.581, Subd. 3(g).
29. That an environmental impact statement for the sports facility has been accepted by the Environmental Quality Board for the State of Minnesota and the Minnesota Pollution Control Agency as provided for in 473.581, Subd. 3(h).
30. That the Commission does not propose to construct, sell or lease any private boxes in the sports facility.
31. That the anticipated revenue from the operation of the sports facility and the revenue from taxes under Section 473.592 will be in an amount sufficient to pay when due all debt service together with administration, operating and maintenance expenses.
32. That the Commission has studied and considered the needs of the University of Minnesota for athletic facilities for a prospective twenty year period.
33. That the Commission and the City of Minneapolis have entered into an agreement whereby the City agrees to impose a liquor tax and the hotel-motel tax at whatever rate or rates are necessary to produce the required revenue for debt service, operation and maintenance of the sports facility to be constructed effective August 1, 1979, which tax shall remain in effect until the agreement is terminated in accordance with law as contemplated and required by 473.581, Subd. 3(l) and 473.592.
34. That the Commission has entered into an agreement with General Mills, Inc. for a period of twenty years and in an amount of one and one-half million dollars determined by the Council to be sufficient to assure the purchase of all unsold tickets whenever more than ninety and less than one hundred percent of the tickets of admission for seats at any professional football game, which were available for purchase by the general public 120 hours or more before the scheduled beginning time of the game have not been purchased 72 hours or more before the beginning time of the game in order to permit the telecast to areas within the State which otherwise would not receive the telecast because of the terms of an agreement the Vikings have with the National Football League; that the record of past ticket sales for the Vikings Football Team and reasonable analysis of later ticket sales indicate that the amount of money General Mills, Inc. has agreed to pay for the purchase of such tickets is sufficient to satisfy the prohibition imposed by Section 473.568.
35. That the total cost of constructing the facility under the construction contracts is $55,000,000 consisting of construction contracts for the stadium in the sum of $52,400,000 and an allowance for construction contingencies in the sum of $2,600,000; that in addition to the construction contracts, the Commission will incur expenses for the following items:

Underwriter's fees and bond sale costs ........ $1,065,000
Insurance and Misc. ........................... 658,000
Architects' fees .............................. 2,090,000
Construction Managers' fees and performance
 bonds ........................................ 2,906,000
 __________
 Total Other Expenses ............. $6,719,000

36. That the Commission intends to pay the above-stated other expenses from interest earned on the proceeds of the bonds.
37. That the City of Minneapolis, the municipality in which the stadium is to be constructed, in issuing its general obligation bonds secured by the full faith and credit of the City, does all of the usual and customary preparatory work required for the issuance of such bonds including advertising, printing and sale of the bonds on competitive bids.
38. The manner in which the City of Minneapolis prepares and sells its general obligation bonds eliminates the payment of underwriting or brokerage fees or commissions.
39. That Chapter 475 limits the underwriters fees and commissions to Two Percent; that the provisions of 473.581, Subd. 2 provides that the bonds shall be sold, issued and secured in the manner provided in Chapter 475.
40. That the Council and Commission have entered into an agreement with Piper, Jaffrey & Hopwood, Inc. (hereinafter called "Piper") for the sale of the stadium bonds at an interest rate not to exceed Seven and One-Half percent per annum, and permits Piper to offer the bonds for sale to the *438 public not to exceed an average premium of 1.9 percent of the principal; that the fees and charges to be paid Piper in connection with the issuance and sale of the bonds, including underwriting discounts, will not exceed the fees and charges customarily payable by the City of Minneapolis for bonds sold and secured by the full faith and credit of said City; that Piper has agreed to pay all expenses in connection with the offer and sale of the bonds including advertising and other selling expenses except the following which the Council and Commission agree to pay: (a) preparation and printing the bonds, preliminary and final official statement, survey and blue sky memorandum, to the extent such costs do not exceed $100,000; (b) the fees of bond counsel, feasibility consultants and auditors retained by the Commission or Council in connection with the sale of the bonds; (c) the fees of the investment rating agencies; (d) the fees and expenses of counsel to the underwriters, to the extent that such fees and expenses do not exceed $75,000, and (e) such other costs and fees and expenses incurred by the Council or Commission in connection with the offer of the bonds.
41. That the underwriting agreement and brokerage fees provided for therein are in compliance with the provisions of M.S. 473.581, Subd. 2 and Subd. 3(n).
42. That the agreement between the Metropolitan Council and the City of Minneapolis executed pursuant to the provisions of M.S. 473.592 is proper and in conformance with the statute.
43. That there is no evidence that any of the highway user tax funds will be used to construct, relocate or improve streets, highways, or other public thoroughfares to provide or improve access to the proposed sports facility.
44. That the City of Minneapolis, in accordance with the provisions of its agreement with the Council and pursuant to the provisions of M.S. 473.592 has levied a sales tax on the gross receipts of retail on-sale liquor sold within the City and upon the gross receipts of motels and hotels, and has further agreed to impose such additional taxes thereon at whatever rate is necessary to produce revenues determined by the Council from year to year to be required which, together with other revenues available to the Commission are sufficient to pay all debt services on bonds, expenses of operation, administration and maintenance of the sports facility.
45. That the Council has made all determinations required by M.S. 473.581, subject to certain conditions, such conditions appearing to the Court to have been satisfied and fulfilled, except:
(1) The Addendum to the Construction Management contract has not been executed by the Commission;
(2) The Performance Bond has not been approved by the Commission.
WHEREFORE, Based upon the foregoing Findings of Fact, the Court makes the following

CONCLUSIONS OF LAW
1. That the Court has jurisdiction of the parties and the subject matter and that justiciable issues exist which entitle the parties to invoke the provisions of the Uniform Declaratory Judgments Act, Minnesota Statute 555 and obtain declaratory judgment of this Court appropriate under the facts and law herein.
2. That all of the proceedings and determinations of the Metropolitan Council and Metropolitan Sports Facilities Commission taken pursuant to the provisions of Minnesota Statutes 473.551, et seq. have been lawfully, properly and validly taken in accordance with all of the applicable statutes.
3. That all of the conditions precedent to the issuance of bonds for the construction of the proposed covered multipurpose sports facility in the City of Minneapolis have been resolved and determined with the exception of (a) approval of Addendum A. to the Construction Management Contract by the Council and Commission and (b) approval by the Council and Commission of the Performance Bond.
4. That the Stadium Act is constitutional.
5. That the determinations made by the Council pursuant to Minnesota Statute 473.581, *439 Subd. 3 are not arbitrary, capricious or unreasonable or in excess of the Council's authority except that the Council's proposal to issue bonds pursuant to the provisions of Minnesota Statute 475.56 is in conflict with the stadium law and therefore the Council may not issue its bonds in excess of $55,000,000.
6. That the proposals, determinations and actions of the Commission and the Council including the interpretation of the stadium law appear in all things to be reasonable, proper and lawful.
7. That upon the Council and Commission approving Addendum A. to the Construction Management Contract and the performance bond and complying with all other statutory requirements for the issuance of its bonds, the Council is authorized to issue and sell its bonds for the construction of the proposed covered sports facility in the City of Minneapolis pursuant to the provisions of the Stadium Act.
The Memorandum following is made a part hereof.
LET JUDGMENT BE ENTERED ACCORDINGLY.
Dated this 24th day of September, 1979.
 /s/ Warren A. Saetre
 Warren A. Saetre
 District Judge
 Thief River Falls, Minnesota

MEMORANDUM
By Order dated September 4, 1979, the Supreme Court of the State of Minnesota appointed the undersigned to serve and discharge the duties of a Judge of the District Court for the Second and Fourth Judicial District to hear the above entitled cases and directed that the trial was to begin September 10, 1979. The Supreme Court further appointed the undersigned, subject to the claim of the Council and Commission that the District Court did not have jurisdiction herein, to hear and make findings as a District Judge or as a Referee appointed by the Supreme Court. A further Order of the Supreme Court dated September 6, 1979 directed the trial of all of the issues involved in this case by the undersigned in the dual capacity of a District Court Judge and as a Referee, subject to the Supreme Court's review, orders and decision. The Court is aware of the rule announced in the case of Reserve Mining v. Herbst, Minn., 256 N.W.2d 808, on appeal, the Supreme Court may make an independent review of all of the actions of the Council and Commission upon the record of all of the evidence herein as to the propriety and legality of the actions taken by the Council and Commission.
In the case of City of New Brighton v. Metropolitan Council, 306 Minn. 425, 237 N.W.2d 620 (1977), the Minnesota Supreme Court stated that "the Council is a political subdivision of the State and is charged by the legislature with responsibility for the orderly development of the Minneapolis-St. Paul metropolitan region." 237 N.W.2d at 623. With respect to discretionary decisions by the Council, the court's scope of review is narrow. The court may only determine whether the Council was within its jurisdiction, was not mistaken as to applicable law, did not act arbitrarily, oppressively, or unreasonably, and to determine whether the evidence could reasonably support or justify the determination. The burden of proof, to demonstrate that there was no reasonable basis for the Council's action, is upon the plaintiff.
Unquestionably, the present case involves the discretionary act by the Council. In Lifteau v. Metropolitan Sports Facility Commission, 270 N.W.2d 749 (1978), the Minnesota Supreme Court noted that the Council had the ultimate discretion, as between the State and Council to determine compliance with all conditions for bond issuance. Because these determinations are discretionary, the narrow scope of review stated above is applicable. In Reserve Mining v. Herbst, supra, the Supreme Court noted that the trial court sits in an appellate capacity in determining an appeal from administrative agencies. See also Arvig Telephone Co. v. Northwestern Bell Telephone, et al., Minn., 270 N.W.2d 111 (1978).
In making its determination in the present case the Council was acting in a legislative capacity rather than judicial or quasi-judicial capacity. This responsibility was delegated by the Legislature to the *440 Council pursuant to Minnesota Statute 473.581, Subd. 3. In determining whether the Council acted arbitrarily, capriciously, or unreasonably, particular attention should be paid to Minnesota Statute 473.552, which states the legislative policy and purpose behind Minnesota Statute 473.551, et seq.:
"The legislature finds that the population in the metropolitan area has a need for sports facilities . . . [i]t is therefore necessary for the public health, safety and general welfare to establish a procedure for the acquisition and betterment of sports facilities and to create a metropolitan sports facilities commission."
The Metropolitan Sports Commission has been functioning now for a period of some two years and gives evidence of developing certain expertise in the areas concerned with acquisition and betterment of sports facilities. The Commission's interpretation of the various statutes are, therefore, entitled to great deference. Minnesota Public Research Interest Group v. Minnesota Environmental Quality Council, 306 Minn. 370, 237 N.W.2d 375 (1975), Mankato Citizens Telephone Co. v. Commissioner of Taxation, 275 Minn. 107, 145 N.W.2d 313 (1966). Defendant Metropolitan Council and Commission contend that their actions are not subject to judicial review. This court holds otherwise. Clearly, any political subdivision of the State must act reasonably in exercising the powers granted to them by the Legislature whether the grant be specific or general. The issue in this case is not the reasonableness of the grant of legislative power, but whether the Council used those powers in an arbitrary, capricious or unreasonable manner. The Council and Commission further contend that the statute itself precludes review. The Attorneys for the Council and Commission cite numerous administrative law cases in their briefs and this court agrees that where the statute clearly precludes judicial review of administrative action, access is restricted. See M. P. I. R. G. v. Minnesota Environmental Quality Council supra.
Minnesota Statute 473.581, Subd. 3, provides in relevant part that the validity of the bonds are not conditioned upon the Council's determination under Subd. 3 which reads:
"For purposes of issuing the bonds the determinations made by the Council shall be deemed conclusive, and the Council shall be and remain obligated for the security and payment of the bonds irrespective of determination which may be erroneous, inaccurate or otherwise mistaken."
This statute by its terms does not foreclose review of the Council's actions. It merely immunizes issued bonds from the effect of a determination by the court or any other body that the bonds were invalid because of a failure to follow statutory required prerequisites to issuance. There is no indication in the statute that these determinations may not be reviewed.
In making the foregoing findings and this memorandum, the court has had the able assistance of counsel for the parties who have responded with extensive briefs and arguments on the issues. Plaintiffs Coleman, et al. call into question both the actions of the Council and Commission as well as the constitutionality of the statute and the interpretation of the law by the Council and Commission. Plaintiffs Coleman questioned the judgment of the Council and Commission in making many of their determinations as required under the statute, many of which involve the future economic conditions that would affect the operation of the stadium. This court does not have a crystal ball by which to judge the actions of the Council and Commission but the evidence is clear that the Council and Commission have had the benefit of highly qualified people to assist them in making their decisions. Certainly there is a lack of evidence in this case upon which the court could find the Council's and Commission's determinations unreasonable. The in-depth study of the Council and Commission of all the economic considerations in determining to construct the stadium is evidenced in the numerous exhibits on file. The court has also been guided by Lifteau wherein Justice Yetka stated:

*441 "We are not persuaded by plaintiffs argument that the law is a bad law because it benefits indirectly some private individuals or corporations; that it is economically unsound; that stadia all over the country have experienced cost overruns; and that the new stadium, if built, will prove to be a "loser" from a revenue standpoint. These arguments are proper arguments to be made to the legislature, or to the Commission itself. It might very well prove to be the case that the revenues from a new stadium, from the admissions tax and from the 2 percent tax on liquor, will be insufficient to pay for both bond principal and interest and for the operations and administrative expenses. But this is a gamble that the bond holders will have to be prepared to take. Decisions such as these are economic matters and political decisions to be made by legislative bodies, not the courts."

While numerous questions are raised in plaintiff Coleman's complaint, the court will discuss in this memorandum only such matters as seem to the court most important.

(1) Are the fees of the architect and construction manager to be included in the $55,000,000 bond limitation? (473.581, Subd. 3(g), 473.556, Subd. 7.)

M.S. 473.581, Subd. 3 reads in part as follows:
"The principal amount of bonds . . . shall not exceed . . . for the construction of a covered multi-purpose sports facility, the total cost of constructing the facility under the construction contracts, not including costs paid from funds provided for by others . . . shall be limited to $55,000,000 (emphasis supplied).
This section of the statute makes reference to 473.581, Subd. 3(g) which requires a determination by the Council that the Commission has executed their agreements which will provide for the construction of its sports facility for a certified construction price and completion date including performance bonds to cover costs over and above the certified price.
M.S. 473.556, Subd. 7 authorizes the Commission to employ persons, firms, architects and construction managers for both designing and constructing all or any part of the stadium. This statute also provides that any contractor must be selected by public bidding. (Emphasis supplied)
The stadium bill was first enacted by Chapter 89, Laws of 1977, the legislature having determined that for the public health, safety and general welfare it being necessary to establish a sports facility commission for the metropolitan area and the metropolitan council was authorized to issue and sell bonds limited to $55,000,000 to construct a covered multi-purpose sports facility. It is to be noted that the legislature placed no limitation on the cost of construction of a stadium but in fact only limited the amount of bonds that could be sold. Chapter 26 of the 1979 Laws, Section 1, Subd. 3 provided that:
"The principal amount of bonds issued pursuant to Subd. 1, clause (a) shall not exceed . . . for the construction of a covered multi-purpose sports facility. . . $55,000,000."
Chapter 203, Laws, 1979 made a change in Subd. 3 of 473.581 and provided that:
". . . the total costs of constructing the facility under the construction contracts, not including costs paid from funds provided by others and the principal amount of bonds issued . . . shall be limited to $55,000,000."
The Council has determined that the legislative intent was to put a limitation on the amount the Commission could spend on the "construction contracts" as well as the amount of bonds the Council could issue. The Council and Commission believe that "construction contracts" refers to the trade contracts let on bids for the actual construction of the stadium. The law seems to support this determination by the Council and that architect and construction managers' fees together with insurance and performance bond costs contracted for pursuant to Subd. 7 of M.S. 473.556 are to be distinguished from "construction contracts." *442 Certainly the legislature could have provided that the total cost of construction should include architects and construction managers' fees, insurance and performance bond costs.
Minnesota Statute 473.581, Subd. 3(c) provides that the council must make a determination that:
"(c) The proceeds of bonds provided for in this subdivision will be sufficient, together with other capital funds that may be available to the commission, to construct or remodel and to furnish the sports facilities proposed by the commission, including the appropriate professional fees and charges but excluding, except as otherwise provided in this subdivision, the acquisition, clearance, relocation, and legal costs referred to in clauses (d) and (e)."
The Council made such a determination in its Resolution No. 79-62.
It seems clear that the legislature by permitting the Commission to employ professionals such as architects and construction managers distinguished them from the contractor-tradesman who will perform the construction work and will be employed by bids. Architects and managers' fees, bond and insurance premiums have little to do with the letting of bids. The certified construction price is $52,400,000 with a contingency fund of $2,600,000 to cover the cost of concealed conditions and unanticipated additional costs. The total of these two sums is $55,000,000, the statutory limit.
M.S. 645.16 requires the Council (and this court) to interpret the laws to effect the intention of the legislature giving consideration to the reasons and circumstances under which the law was enacted, the object to be obtained and in so doing reference may be had to former laws upon the same subject and the consequences of the particular interpretation. The history of the stadium law and the language of the present statute gives credence to the interpretation of the Council and Commission.

(2) Is the interest the Council and Commission will receive on the proceeds of the sale of bonds available to use in the construction of the stadium and to pay the architect and construction managers' fees? (473.581, Subd. 3(c))

Minnesota Statute 473.581 provides that except where there is a conflict, the bonds are to be sold, issued and secured as provided for by Chapter 475. Minnesota Statute 475.65 provides in part:
". . . the proceeds may be invested and reinvested in accordance with the law, and the income and gain therefrom shall be held as part of the proceeds. . ."
This statute does not appear to be in conflict with M.S. 473.551, et seq. It would thus appear that the interest earned on the proceeds from the bond sale are in fact bond proceeds and are thus available to pay capital costs that do not fall within the $55,000,000 limitation.

(3) To what extent does the Commission have discretion to negotiate a lease with the Minnesota Twins for the use of the stadium, which lease permits the Twins to terminate the lease under the financial capability clause of the statute? (473.581, Subd. 3(a))

The statute states:
"The agreements may contain provisions negotiated between the organizations and the commission which provide for termination upon conditions related and limited to the bankruptcy, insolvency, or financial capability of the organization." (Emphasis supplied).
The Commission's lease with the Minnesota Twins provides for termination of the lease in the event of their inability to sell an average of the lesser of (a) 1,400,000 tickets annually or (b) an average of the number of tickets sold by all of the teams in the American League during a baseball season for three consecutive seasons or (2) for three consecutive fiscal years the Twins have a net operating loss. Further, the lease provides in Section 3.2 that "if the lack of air conditioning substantially adversely affects attendance at home games *443 and thus the team's revenues, the team may give the Commission notice of such effect. If the Commission does not install air conditioning before the commencement of the baseball season next following such notice, subject to the availability of the equipment, the team may terminate this agreement."
Quite obviously the legislature intended that the Commission should have some discretion in permitting the termination of the thirty year lease if the Commission determined that the team did not have the financial capability to carry out the terms of the lease. The Commission has determined that the lease may be terminated if for three years the attendance is insufficient or for three consecutive years the Twins have a net operating loss, or it may be terminated if the Commission refuses to install air conditioning and it is shown that attendance has been adversely affected thereby. Certainly the Commission must have considered that there are many factors affecting the ability of the Twins to sell tickets, but this court is not prepared to say that a minimum sale of 1,400,000 tickets or the average number of tickets sold by all of the teams in the American League during a baseball season for three consecutive seasons is arbitrary or capricious. The decision to not install air conditioning equipment was based upon expert advice given to the Commission. It may be that the Commission will be required to install the equipment in which event apparently the present design of the stadium contemplates.
It would seem that if the Twins continually lose money in their operation, their financial capability to continue to operate under the terms of the lease will be affected. While the legislature did not define the meaning of the words "financial capability", the court cannot say that the Commission's interpretation is arbitrary.

(4) Are the agreements with the National Football League and the American Baseball League "guarantees" within the meaning of M.S. 473.581, Subd. 3(b)?

The Statute reads:
"The commission had executed agreements with professional baseball and football major leagues which guarantee the continuance of franchises in the metropolitan area for the period of the agreements referred to in clause (a)."
By Resolution No. 79-67 the Council determined that the Commission had complied with the statute and the agreements with the leagues have been executed. The agreements with the American League of Professional Baseball Clubs and the National Football League are similar and both agreements refer to the requirements of 473.581, Subd. 3(a) and (b) and in compliance therewith guarantee the continuance of the franchise of the teams in the metropolitan area by promising and agreeing that they will not voluntarily approve the relocation of the league memberships if such relocation would be in violation of the Commission's lease agreements with the Vikings and Twins; further, the leagues agree if the teams' membership in the leagues are terminated, the leagues shall for a period of ninety days agree to the assignment of the lease agreements to a third party which will assume the team's obligations under the lease agreements. The agreements with the leagues do not require the leagues to perform the team's obligations under the lease agreements nor to obligate the leagues to create and provide owners to operate the teams in the stadium. The leagues will not honor any request by the teams for the transfer of the franchise to another city in violation of the terms of the lease agreement and neither the teams nor leagues may move the franchises to another city merely for the purpose of taking advantage of a more lucrative opportunity. The major leagues have agreed to honor the lease agreements and will not approve the transfers of the franchises if the transfer is in violation of the lease agreements. From all of the evidence in this case and a careful reading of the statute, the court is of the opinion that it is the legislative intent to prohibit the major leagues from arbitrarily or summarily transferring the franchises to another location and that the intent of the legislature has been respected by the Commission *444 in its agreements with the major leagues. In the sense that the legislature uses the word "guarantee", it is synonymous with the word warrant or promise. Meritt v. Haas, 113 Minn. 219, 129 N.W. 379 (1911), 18 Words & Phrases, Permanent Edition, Pages 643-646. It would be an absurdity to construe this statute to mean the legislature intended for the major leagues to guarantee to operate a team in the stadium for a period of thirty years. The key words in the statute are ". . . guarantee the continuance of franchises in the metropolitan area for the period of the agreements. . .". The lease agreements specifically refer to this guarantee clause in the statute and in fulfillment thereof the leagues agree and promise (guarantee) that they will not permit the transfer of the franchises so long as the lease agreements with the Twins and Vikings are in effect and if the leases are terminated, the Commission shall have a right to secure other owners of the franchises. The agreements with the major leagues appear to be in reasonable contemplation and respect for the language of the statute.

(5) Is the agreement with General Mills sufficient to insure the purchase of all unsold tickets thereby authorizing the release of the Vikings Football Team from the provisions of 473.568? (473.581, Subd. 3(m))

M.S. 473.581, Subd. 3(m) requires the Commission to obtain a purchaser of tickets for not less than twenty years which will assure compliance with M.S. 473.568 permitting the televising of games. The amount determined by the Commission to be sufficient to assure the purchase of such unsold tickets is one and a half million dollars. The evidence reasonably supports the judgment of the Commission and the Council in this determination. The evidence discloses that the Vikings annually sell 40,000 season tickets and have a waiting list of 15,000 applicants for season tickets. In the past four years they have sold out every game and except on two occasions due to weather or other unusual conditions, all tickets were fully sold in advance of 72 hours before game time. The covered dome is expected to eliminate weather as an attendance factor. Based upon the Vikings history of ticket sales, upon the league averages and the present inflation rate, the agreement appears to be reasonable. Further, in addition to the Commission's agreement with General Mills, the Vikings Football Team has an agreement with General Mills that provides that such unsold tickets which General Mills is obligated to purchase by its agreement with the Commission, will be sold by the Vikings as agent for General Mills and such sales shall be deducted from the amount General Mills is obligated to pay under its agreement with the Commission. The Vikings further have agreed to pick up the excess over $150,000 per year up to a maximum of one and a half million dollars. If the past history of the Vikings ticket sales is any indication of the future, the amount of money General Mills is pledged to use to purchase tickets should be more than adequate.

(6) Is the brokerage fee to be paid Piper, Jaffray & Hopwood in violation of 473.581, Subd. 3(n)?

The Statute reads:
"The council has entered into an agreement with the brokerage firm or brokerage firms to be used in connection with the issuance and sale of the bonds guaranteeing that fees and charges payable to the brokerage firm or firms in connection therewith, including any underwriting discounts, shall not exceed fees and charges customarily payable in connection with the issuance and sale of bonds secured by the pledge of the full faith and credit of the municipality in which any new sports facility is to be located." (Emphasis supplied)
The Clerk of the City of Minneapolis testified that since the City does all of its own legal work which ordinarily is done by the underwriter in the sale of the City's general obligation bonds, no underwriter's fees as such are paid. In fact, it appears that the City prepares and sells its bonds on competitive bids which often results in a premium *445 paid to the City. The premium apparently results because the City of Minneapolis general obligation bonds carry a higher rate of interest. The Council and Commission's agreement with Piper provides for the sale of $55,000,000 special obligation bonds to the underwriters who may resell the bonds to the public at a premium not to exceed 1.9 percent of the aggregate principal amount of the bonds. The parties also further agree that for more effective marketing of the bonds, the bonds may be purchased by the underwriters at a discount to be agreed upon by the parties. Such further agreement as to discount is conditioned upon the agreement provision that all fees and charges proposed to be paid to the underwriter for the sale of the bonds, including underwriter's discounts, "will not exceed fees and charges customarily payable in connection with the issuance and sale of the bonds secured by the full faith and credit of the City of Minneapolis." The agreement further provides that certain expenses would be paid by the underwriter while other expenses would be paid for by the Council and Commission.
Because of the manner in which the City of Minneapolis has marketed its general obligation bonds, a "customary" fee has not been determined. However, the stadium law cross-references the state bonding law, M.S. 475 which provides for a statutory maximum of two percent for general obligation bonds. M.S. 473.581, Subd. 2 provides that the bonds "shall be sold, issued, and secured in the manner provided in Chapter 475 . . . except as otherwise provided in Sections 473.551 to 473.595. . .".
Exactly what commissions or fees the underwriter will be paid cannot be determined until just immediately before the bonds are issued and sold, however, the agreement gives no indication that the provisions of the statute will be violated.
Received into evidence as part of Plaintiff's Exhibit 14-B is a letter from Springsted, Inc., public finance advisers, to the Metropolitan Council advising the Council of the propriety of the bonding agreement with Piper. That letter states in relevant part:
"Two percent is probably the industry average underwriting cost for revenue issues. Two percent was the underwriting cost paid by the City of Minneapolis for its $55,240,000 mortgage revenue bonds issues in November, 1978, and also by the City of St. Paul for its $50,000,000 mortgage revenue issue in March of this year. We do not know precisely what issuance costs for these issues were included in the underwriting cost which are not included in the underwriting proposal before the Council, but believe that probably more of the issuance costs were included in the underwriting cost of those issues. However, it is our opinion that this issue is of greater complexity and is demanding of a larger "takedown" (cost of distribution) by reason of which we believe the amount of issuance cost to be paid by the Council is justifiable and reasonable. Based upon our conversations with representatives of the underwriters it is our understanding of the proposed agreement that should the takedown portion of the underwriting cost be less than $14, a fact which will be disclosed by the underwriters at the time a firm offer is made, the 1.9 percent will be adjusted downward accordingly.
"In our opinion if the City of Minneapolis were the issuer of these bonds, the underwriting and issuance cost would be comparable to those proposed to the Council by the underwriters."
The Council agreement with Piper, Jaffray & Hopwood, Inc. does not violate the statute.
More troublesome is the proposal of the Council to issue an additional $1,065,000 bonds pursuant to the provisions of Minnesota Statute 475.56. The Council contends that 473 does not conflict with 475 and therefore since the Council has all the powers and duties of a municipality in issuing bonds, it has the authority to issue the additional bonds which it intends to use to pay the underwriter's fee. The Council further argues that 475.56 does not require the *446 additional two percent bonds be included in the amount authorized by the electorate to be issued for the reason that the electors need not be notified of the additional two percent since the two percent represents the cost of the borrowing. The court in determining that the Council was not authorized to issue and sell an additional two percent of the amount otherwise authorized to be issued is satisfied from the history of the stadium bill that the legislature intended the bond issue to be limited to $55,000,000 and M.S. 475.56 is in conflict with that limitation.

(7) Has the Commission executed an agreement for the construction of the stadium for a certified price and provided for performance bonds in accordance with 473.581, Subd. 3?

The Statute reads (g):
"The commission has executed agreements which will provide for the construction of its sports facility for a certified construction price and completion date and which include performance bonds in an amount at least equal to 100 percent of the certified price to cover any costs which may be incurred over and above the certified price, including but not limited to costs incurred by the commission or loss of revenues resulting from incomplete construction on the completion date."
The Council made a determination by Resolution No. 79-63, conditioned upon the execution of the agreement and addendums and the execution of a bond.
Section 2.1.1 of the Construction Management Agreement requires that the construction manager provide a certified maximum price and a certified completion date by way of the execution and delivery of "Addendum A" to the contract. Addendum A has been executed by the construction manager and provides for a certified maximum price of $52,400,000 and a certified completion of April 1, 1982. Although, Addendum A has not been executed by the Commission, upon execution, the requirements of a certified maximum price and a certified completion date will have been fulfilled.
The Construction Management Agreement also provides for bonds as required by the statute. Section 7.1 of the Agreement specifically states:
"It is the express intention that the bond furnished hereunder comply with each and all of the requirements of the Act, including but not limited to the Construction Manager's guarantee to the Commission and the trustee that the Construction Manager (i) will perform his work under this contract, (ii) will make payment to the Commission in respect of the certified maximum price according to the terms of this contract, (iii) will insure proper payment for all who furnish labor, materials, supplies and equipment used in the prosecution of the work under this contract, and (iv) will cover any costs which may be incurred by the Commission for loss of revenues by the Commission resulting from incomplete construction on the certified completion date."
Section 10.1 of the Agreement provides for payments to the Commission when the guaranteed maximum price is exceeded and payments for lost revenue if the facility is incomplete on the construction date, as required by the statute.
The contract does provide, particularly in Article V for changes in the Certified Construction Price, and Certified Completion Date under the circumstances stated therein. Such a provision is not prohibited by the statute. When interpreting this contract it is important to keep in mind that we are dealing with a massive construction project. A mere recitation of the statutory language would be insufficient to contract for the construction of a project of these proportions and of course was not so intended by the legislature. Section 11.2 of the Agreement specifically states:
"11.2 Governing Law: This contract shall be governed by laws of the State of Minnesota and shall be construed in such a manner as to comply with the laws of the State of Minnesota which apply to the project, including specifically M.S. 473.551 to 473.595, as amended."
*447 The court is satisfied that the Construction Management Contract addendum and performance bond when executed by the Council and Commission complied with 473.556, Subd. 7 and 473.581, Subd. 3.

(8) Is the Council's determination that the anticipated revenues from the operation of the sports facility including taxes sufficient to pay debt service and operating costs? (473.581, Subd. 3(j))

The Council determined that such revenues were sufficient by its Resolution No. 79-65. This determination, certainly an economic one, was based upon the extensive studies prepared for the Commission and Council and there is no evidence to justify the court in disturbing the Council's determinations. The Coopers and Lybrand consultant report received into evidence (Plaintiff's Exhibit 15) in summary, on page 5 states:
"As a result of the foregoing, we express the opinion that the report of the Metropolitan Sports Facilities Commission correctly predicts that the anticipated revenue from the operation of the proposed Minneapolis multi-purpose covered stadium, plus other revenue available to the Commission, including revenue from the liquor hotel-motel taxes assessed under Section 11 will be sufficient to pay, when due, all debt service in connection with construction of the facility and existing bonded indebtedness of the Commission, plus all of administration, operating and maintenance expenses of the facility."
The Report, of course, is based upon basic assumptions which have not been refuted during the course of this trial. Certainly if the assumptions prove incorrect, revisions will be required. One of the assumptions is "that construction will be substantially completed no later than December 31, 1981 for an amount within the funds available from authorized revenue bonds in the amount of $56,065,000 issued in October, 1979".
Since the court has determined that the applicable statutes permit only $55,000,000 in bonds to be issued, a revision will be required. However, since the debt will be accordingly less, less revenues will be required for debt service. Also, the construction contracts call for certified completion date of April 1, 1982 rather than December 31, 1981. Adjustments will have to be made accordingly.

(9) Is the Statute constitutional?

Plaintiffs Coleman allege that Minnesota Statutes 473.592 and 473.595, Subd. 7 are unconstitutional.
M.S. 473.592 provides for the agreement between the Council, Commission and City of Minneapolis to impose a sales tax upon retail on-sale liquor and gross receipts of hotels and motels located within the City. The rate of tax shall be whatever necessary to produce revenues to be determined by the Council from year to year to pay debt service on bonds, operation, administration and maintenance of the sports facility. The City of Minneapolis has now imposed a three percent tax on the gross receipts from all on-sale liquor and a three percent tax on motel-hotel gross receipts. Plaintiff Robert Short testified that the motel-hotel tax is most objectionable, especially insofar as the Leamington Hotel is concerned, a convention hotel operating in a highly competitive field. The tax in Mr. Short's judgment will seriously affect this hotel because of the unfair advantage given to convention hotels lying outside the limits of the City of Minneapolis. However, the testimony also indicated that most, if not all other hotel-motel operators within the City favor the stadium and accompanying tax on the assumption that the stadium will in fact benefit them as the legislature also has assumed. Lifteau clearly establishes that the legislature may legitimately establish taxing districts. The changes made in the law since Lifteau narrowing the taxing district to the City of Minneapolis does not change the rationale of Lifteau and the court is satisfied that the statute providing for the on-sale liquor, motel-hotel tax in the City of Minneapolis is constitutional.
M.S. 473.595, Subd. 7 permits the Commission to sell seats in the stadium thereby giving the purchaser first preference for the purchase of season tickets for the admission *448 to professional sports exhibitions. The owner of such seat is permitted to transfer ownership and the Commission has the right to charge maintenance not to exceed $10 a year for such seat. Petitioner Coleman has not cited any authority for his claim of unconstitutionality of this Section and the court has found none to support Petitioner's claim and the court considers the presumption of constitutionality conclusive.
It is contended that Minnesota Statute 473.597 is unconstitutional.
The Statute provides:
"Pursuant to Article VI, Section 2, of the Minnesota Constitution the Supreme Court shall have original jurisdiction of any action brought or maintained in which an issue is presented as to the validity of a provision of Laws 1979, Chapter 203, Sections 1 to 14, and may hear and determine the issue as provided in Title V of the Rules of Civil Appellate Procedure, after notice given as provided in Rule 144."
Article VI, Section 2 of the Minnesota Constitution confers on the Minnesota Supreme Court "original jurisdiction in such remedial cases as are now prescribed by law. . ."
Hunt v. Hoffman, [125] Minn. 249, 146 N.W. 733 (1914), involved the constitutionality of the statute which conferred original jurisdiction on the Supreme Court to compel a city canvassing board to correct a mistake. The court stated that "the remedial cases", which the legislature may give this court original jurisdiction, are only those special or extraordinary proceedings where the remedy is offered summarily through certain "original remedial writs" such as Mandamus, Certiorari, Quo Warranto, Prohibition, Habeas Corpus and the like". 146 N.W. at 734. It was noted by the court, that they are not particular about names of actions and the relief as requested was in the nature of mandamus proceedings, therefore, falling within Article VI, Section 2 of the Constitution.
 W. Saetre

APPENDIX C

STATE OF MINNESOTA IN SUPREME COURT
Minnesota Vikings Football
Club, Inc., and Michael E.
Lynn, III,
 Respondent,
and
The City of Minneapolis,
intervenor,
 Respondent,
50599 vs.
Metropolitan Council,
 Respondent,
Piper, Jaffrey & Hopwood,
Inc.,
 Respondent,
Nicholas D. Coleman,
et al,
 Petitioner,
Metropolitan Sports
Facilities Commission,
 Respondent.

ORDER
The above-entitled matter came on for hearing before the Minnesota Supreme Court sitting en banc on Thursday, October 4, 1979 at 8:30 a. m. The appearances were as follows: David C. Forsberg, B. C. Hart, Peter W. Sipkins, and John Hoeft, representing the Metropolitan Council; Wayne H. Olson and David R. Knodell, on behalf of the Metropolitan Sports Facilities Commission; Hyman Edelman and William C. Pentelovitch, representing the Minnesota Vikings Football Club, Inc. and Michael E. Lynn III; Jerome R. Jallo, on behalf of the City of Minneapolis; and William S. Rosen and Brian P. Short, on behalf of Nicholas D. Coleman, Robert O. Ashbach, Robert E. Short, et al.
Having heard and reviewed the arguments of counsel, it is the unanimous opinion and judgment of this court that:
(1) The Supreme Court of the State of Minnesota does have jurisdiction to determine *449 whether Nicholas D. Coleman, Robert O. Ashbach, Robert E. Short, et al have waived their right to appeal to this court from the decision of the Honorable Warren A. Saetre dated September 24, 1979;
(2) The said Nicholas D. Coleman, Robert O. Ashbach, Robert E. Short, et al have in fact waived their right to appeal by failing to perfect such an appeal within 3 days from September 24, 1979, the date on which the subject-decision was filed and on which all parties received notice of the decision;
(3) The motion of the Metropolitan Council, et al should be, and the same is, granted to the limited extent that it is determined that the time to appeal from the decision of September 24, 1979 has expired; the motion of Nicholas D. Coleman, Robert O. Ashbach, Robert E. Short, et al should be and is denied.
(4) Nicholas D. Coleman, Robert O. Ashbach, Robert E. Short, et al should be and are hereby granted the right to apply to this court for an order relieving them of their waiver of their right to appeal upon a substantial showing
(a) that such relief can be accorded without prejudice or damages to other persons affected by the pendency of these proceedings; and
(b) that, if relief from the said waiver is granted, they have a reasonable prospect of prevailing in the event that a review of the decision of the Honorable Warren A. Saetre is accorded.
The application for relief from the waiver of the right to appeal and any supporting briefs or data must be served and filed with the clerk of this court not later than 10:00 a. m., Monday, October 8, 1979. Briefs and data in opposition thereto may be served and filed on or before 2:00 p. m. of that same date. The court will then convene en banc at 3:00 p. m. on Monday, October 8, 1979 in the court chambers at the State Capitol to consider any petition for relief from the waiver of the right to appeal which may be submitted and will hear oral arguments from the parties in interest for a total time not to exceed 1½ hours.
Dated:
 BY THE COURT:
 (s) Robert J. Sheran 
 Chief Justice
 (s) James C. Otis 
 Associate Justice
 (s) Walter F. Rogosheske 
 Associate Justice
 (s) C. Donald Peterson 
 Associate Justice
 (s) Fallon Kelly 
 Associate Justice
 (s) John J. Todd 
 Associate Justice
 (s) Lawrence R. Yetka 
 Associate Justice
 (s) George M. Scott 
 Associate Justice
 (s) Rosalie E. Wahl 
 Associate Justice