## MINNESOTA PUBLIC INTEREST RESEARCH GROUP AND OTHERS v. MINNESOTA ENVIRONMENTAL QUALITY COUNCIL AND OTHERS.

237 N. W. 2d 375.

December 19, 1975—Nos. 45943, 46027.

*Elliot C. Rothenberg,* for appellants.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, *Richard G. Mark,* Assistant Solicitor General, and *Jean E. Heilman* and *Larry Salustro,* Special Assistant Attorneys General, for respondent Minnesota Environmental Quality Council.

*Warren Spannaus,* Attorney General, and *Sandra S. Gardebring,* Special Assistant Attorney General, for respondent Minnesota Pollution Control Agency.

*Popham, Haik, Schnobrich, Kaufman & Doty, Raymond A. Haik,* and *Rolfe A. Worden,* for intervenor-respondent AMAX Exploration, Inc.

*Dayton, Herman & Graham* and *John H. Herman,* for Sierra Club, North Star Chapter, amicus curiae, seeking reversal.

Heard before Otis, Todd, MacLaughlin, Scott, and Knutson, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This action involves the decision of Minnesota's Environmental Quality Council (hereinafter EQC) that an "environmental impact statement" [1] (hereinafter EIS) need not be prepared prior to the construction of an exploratory copper-nickel mine by AMAX Exploration, Inc., near Babbitt, Minnesota. On July 30, 1974, plaintiff Minnesota Public Interest Research Group (hereinafter MPIRG) filed with defendant EQC a petition seeking an EIS. On November 12, 1974, EQC decided that an EIS was not required. MPIRG and three other organizations concerned with protecting the environment filed suit in the District Court of Hennepin County seeking reversal of that decision. On March 7, 1975, the Minnesota Pollution Control Agency (hereinafter PCA) was added as a defendant, and PCA was

---

[1] Minn. St. 116D.04, subd. 1, sets forth the requirements of an environmental impact statement as:

"* * * [A] detailed statement prepared by the responsible agency or, where no governmental permit is required, by the responsible person, on:

"(a) The environmental impact of the proposed action, including any pollution, impairment, or destruction of the air, water, land, or other natural resources located within the state;

"(b) Any direct or indirect adverse environmental, economic, and employment effects that cannot be avoided should the proposal be implemented;

"(c) Alternatives to the proposed action;

"(d) The relationship between local short term uses of the environment and the maintenance and enhancement of long term productivity, including the environmental impact of predictable increased future development of an area because of the existence of a proposal, if approved;

"(e) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented;

"(f) The impact on state government of any federal controls associated with proposed actions; and.

"(g) The multistate responsibilities associated with proposed actions."

temporarily enjoined from granting a permit to AMAX for waste disposal related to the exploratory mine. On March 14, 1975, AMAX was permitted to intervene in the action. On April 16, 1975, upon defendants' motion for summary judgment, the district court determined that the AMAX project was a private action of only local significance, that delay in its commencement would prevent gathering of data on the copper-nickel resources of the state and the impacts of potential copper-nickel development, that the necessary waste disposal permit would have to be obtained from the PCA, and that the EQC resolution was not a commitment to copper-nickel development. The court further determined that plaintiffs were not entitled to judicial review, granted the motion for summary judgment, and vacated the temporary injunction. Plaintiffs appeal from that order.

The AMAX project consists of an exploratory test shaft 14 feet in diameter and 1,705 deep, with 3,300 feet of tunnels, which will be excavated over a period of 18 months. The purpose of the shaft is to get information on the grade, size, and shape of the mineral deposits identified by surface drilling. The project will involve the removal of 60,000 tons of rock. The waste rock will be spread over 6 acres of land next to the test shaft to a depth of 5 feet. Two settling ponds, which together with dikes will cover a total of 2 1/2 acres, will be constructed for shaft dewatering. The total surface area disturbed will be 10 acres.

The land involved is 4 miles southeast of Babbitt, Minnesota, and 20 miles south of the Boundary Waters Canoe Area, and is part of School Trust Fund lands leased by the state, pursuant to Minn. St. 93.25, to Bear Creek Mining Company in 1966 for a term of 50 years. The shaft will be 2 miles south of Reserve Mining Company's Peter Mitchell taconite mine and 3 miles southwest of the Erie Mining Company's Dunka River taconite mine.

The project site lies within the watersheds of Langley Creek and the Dunka River, which drain into Birch Lake, the Kawishiwi River, and in turn into the Boundary Waters Canoe Area. An

ongoing monitoring program for surface and ground water to be conducted by AMAX has been approved by the Minnesota Department of Natural Resources and the PCA.

On July 30, 1974, pursuant to Minn. St. 1974, § 116D.04, subd. 3, MPIRG submitted a petition to EQC signed by over 500 persons, requesting that an EIS be prepared for the AMAX test shaft project. On August 28, 1974, AMAX submitted an environmental assessment of the project.[2] On August 21, 1974, EQC was informed that International Nickel Company was proposing an open-pit copper-nickel mine in Minnesota. On October 8, 1974, EQC adopted a resolution calling for the preparation of a regional EIS on the cumulative effects of copper-nickel mining in northern Minnesota and an EIS on the open-pit copper-nickel mine proposed by International Nickel.

On August 21, 1974, EQC's citizens advisory committee recommended that an EIS be required on the AMAX proposal. The technical committee of EQC discussed the AMAX test shaft at several meetings and on November 4, 1974, recommended to the EQC that an EIS not be required for the test shaft. On November 12, 1974, the EQC resolved:

"THAT the proposed AMAX Project is not a major private action of more than local significance, and that the exploratory action does not have the potential for significant environmental effects.

"THAT an Environmental Impact Statement shall not be required by the MEQC on the AMAX Project.

"THAT delay in commencement of the AMAX exploration project and continuation of the environmental monitoring program

---

[2] An environmental assessment differs from an EIS in that the former is less extensive and contains less baseline data about the project's environment. AMAX's assessment consists of reports on water sampling, some maps and photos of the area, and a report on a reconnaissance visit by AMAX consultants from October 29 to November 2, 1973. There is no statutory requirement for an environmental assessment, but it is provided for by Minn. Reg. MEQC 25.

will prevent the gathering of data concerning the nature of the copper/nickel resource and the impacts of potential copper/nickel development.

\* \* \* \* \*

"THAT this resolution shall not be construed as a commitment to copper/nickel development in the state and that any exploration project, such as the AMAX proposal, is undertaken at the risk of the proposer and does not obligate the state to approve any subsequent proposed mining development."

The issues presented are as follows:

1. Is EQC's decision not to require an EIS subject to judicial review under Minn. St. c. 116D, the so-called Environmental Policy Act?

2. Is EQC's decision not to require an EIS subject to judicial review under the Administrative Procedure Act?

3. Was the trial court's determination that the EQC was not arbitrary in refusing to require AMAX to furnish an EIS proper?

The threshold question is whether EQC's decision not to order an EIS is subject to judicial review. MPIRG petitioned EQC under Minn. St. 1974, § 116D.04, subd. 3, which states:

"Upon the filing with the council of a petition of not less than 500 persons requesting an environmental impact statement on a particular action, the council shall review the petition and, where there is material evidence of the need for an environmental review, require the preparation of an environmental impact statement in accordance with provisions of this section." [3]

The purpose of this section is to provide an avenue by which the public may obtain a forum regarding specific matters which may require environmental review. The section is similar in this respect to Minn. St. 116C.05, subd. 2(a), [4] which requires state-

[3] Amended by L. 1975, c. 204, § 74.
[4] Formerly Minn. St. 1974, § 116C.05, subd. 2(b).

wide public meetings of the EQC's citizens advisory committee, and to § 116C.58, which requires annual public hearings regarding sites for power plants.

We find that although the right to a hearing regarding a petition is not specifically stated in § 116D.04, subd. 3, as it is in other sections,[5] the right is implied in the purpose of the act. Minn. St. 116C.01, to which the policies and goals of c. 116D are supplementary,[6] states:

"* * * The legislature also finds that further debate concerning population, economic and technological growth should be encouraged so that the consequences and causes of alternative decisions can be better known and understood by the public and its government."

While Minn. St. 116C.06 requires the EQC to hold hearings on "matters that it determines to be of major environmental impact," so that the EQC can recommend administrative and legislative actions on such matters, that chapter is silent on the question of required hearings or the appealability of an EQC decision not to require an environmental impact statement upon the petition of 500 citizens.

There is a presumption in favor of judicial review of agency decisions in the absence of statutory language to the contrary.[7]

---

[5] See, e. g., Minn. St. 116D.04, subd. 9.

[6] Minn. St. 116D.06, subd. 2.

[7] See Barlow v. Collins, 397 U. S. 159, 166, 90 S. Ct. 832, 837, 25 L. ed. 2d 192, 199 (1970): "* * * [P]reclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. * * * Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated."

See, *Reviewability of Administrative Action: The Elusive Search for a Pragmatic Standard*, 1974 Duke L. J. 382, 384: "* * * Early cases suggested that review might be considered prohibited by the mere fact that a statute holds some acts reviewable and says nothing about others. It seems reasonable to conclude, however, that in the absence of clear and convincing evidence of legislative intent to preclude judicial review,

The United States Supreme Court in Abbott Laboratories v. Gardner, 387 U. S. 136, 140, 87 S. Ct. 1507, 1511, 18 L. ed. 2d 681, 687 (1967), said:

"* * * [J]udicial review of a final agency action will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress. * * * [O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."

In an earlier case, Stark v. Wickard, 321 U. S. 288, 309, 64 S. Ct. 559, 570, 88 L. ed. 733, 747 (1944), the United States Supreme Court similarly declared:

"* * * When * * * definite personal rights are created by federal statute, similar in kind to those customarily treated in courts of law, the silence of Congress as to judicial review is, at any rate in the absence of administrative remedy, not to be construed as a denial of authority to the aggrieved person to seek appropriate relief in the federal courts in the exercise of their general jurisdiction. When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. * * * The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction."

AMAX argues that the Federal statutes involved in the Abbott

the modern day presumption of review has made the above reasoning obsolete."

See, also, Jaffe, Judicial Control of Administrative Action, p. 357: "* * * The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent."

See, also, Davis, "*Judicial Control of Administrative Action*": A Review, 66 Col. L. Rev. 635, 650.

Laboratories and the Stark decisions were intended by Congress to be supplemental to existing legal remedies. Certainly, the Minnesota Legislature in enacting c. 116D also intended to supplement the public's right to a clean environment, recognized in c. 116B, the Minnesota Environmental Rights Act. Minn. St. 116B.01 declares:

"The legislature finds and declares that each person is entitled by right to the protection, preservation, and enhancement of air, water, land, and other natural resources located within the state and that each person has the responsibility to contribute to the protection, preservation, and enhancement thereof. The legislature further declares its policy to create and maintain within the state conditions under which man and nature can exist in productive harmony in order that present and future generations may enjoy clean air and water, productive land, and other natural resources with which this state has been endowed. Accordingly, it is in the public interest to provide an adequate civil remedy to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction." [8]

Respondent AMAX points out that the Stark and Abbott Laboratories cases involved statutes which were enacted prior to the Federal Administrative Procedure Act. That act, however, was not intended to alter, but rather only to codify, existing rules relating to reviewability of administrative acts. Davis, 4 Administrative Law Treatise, § 28.08. Stark was decided before passage of the Administrative Procedure Act, but there is nothing in Abbott Laboratories, decided 20 years later, which indicates that the passage of the act reduced the availability of judicial review.

The principle presuming reviewability of agency decisions has been applied in cases interpreting the National Environmental Policy Act. In Environmental Defense Fund v. Corps of Engineers, 470 F. 2d 289 (8 Cir. 1973), certiorari denied, 412 U. S. 931, 93 S. Ct. 2749, 37 L. ed. 2d 160 (1973), where the central

---

[8] See, Minn. St. 116D.06, subd. 2.

issue was the adequacy of an environmental impact statement, the United States Court of Appeals rejected the contention of defendant that its decisions under NEPA were immune from judicial scrutiny. The court held (470 F. 2d 298):

"The unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act * * *.

\* \* \* \* \*

"Given an agency obligation to carry out the substantive requirements of the Act, we believe that courts have an obligation to review substantive agency decisions on the merits. Whether we look to common law or the Administrative Procedure Act, absent 'legislative guidance as to reviewability, an administrative determination affecting legal rights is reviewable unless some special reason appears for not reviewing.' * * * Here, important legal rights are affected. NEPA is silent as to judicial review, and no special reasons appear for not reviewing the decision of the agency. To the contrary, the prospect of substantive review should improve the quality of agency decisions and should make it more likely that the broad purposes of NEPA will be realized."

The Minnesota Environmental Policy Act, because of its provision authorizing citizens to petition for an EIS, goes further than NEPA in the creation of environmental rights; therefore, there is an even stronger presumption in favor of judicial review for decisions regarding environmental impact statements under the Minnesota Environmental Policy Act than under NEPA. In the absence of any language in the statute precluding judicial review, we hold that Minnesota courts have jurisdiction to hear appeals in these cases from decisions of the EQC.

Defendant, AMAX, argues that the Environmental Defense Fund case involved the question of the adequacy of an agency's environmental impact statement whereas the instant case involves the discretionary decision of an administrative agency

not to require an impact statement's preparation. The former type of administrative agency decision, AMAX contends, is less protected from judicial scrutiny. This argument overlooks the fact that the Court of Appeals' stated basis for allowing judicial review was not that an agency has no discretion in preparing its environmental impact statement, but rather that "important legal rights" were affected. 470 F. 2d 298. The same "important legal rights" are involved here.

Plaintiffs also allege in their petition for review that this is a decision reviewable under the Administrative Procedure Act, Minn. St. 15.0424. In order to be subject to review under that statute, plaintiffs must be found to be "aggrieved by a final decision in a contested case." *Id.* This is a common requirement among state administrative procedure requirements. Cooper, State Administrative Law, p. 120. See, e. g., Town of Norway v. State Board of Health, 32 Wis. 2d 362, 145 N. W. 2d 790 (1966). The term "contested case" is defined in Minn. St. 15.0411, subd. 4:

" 'Contested Case' means a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing."

The requirement that MPIRG be "aggrieved by a final decision in a contested case" raises the question of whether § 116D.04, subd. 3, required the EQC to hold a hearing on the petition for an EIS. Under the principles discussed above, it seems apparent that a hearing would be appropriate. Where, as here, there is understandable evidence of a public demand for an environmental review in this important, sensitive field, we conclude that a hearing is required to fulfill the purposes of c. 116D. We find also that the EQC granted an adequate hearing in this case.

The "contested case" requirement was interpreted in Independent School District No. 581 v. Mattheis, 275 Minn. 383, 147 N. W. 2d 374 (1966), in which this court said that where a hear-

ing is required, the matter is a "contested case." Because we find that a hearing is required here under Minn. St. 116D.04, this matter is a contested case and judicial review follows under Minn. St. 15.0424.

Plaintiffs also argue that they have a constitutional right to a hearing because of the due process clause of the Fourteenth Amendment. We do not find it necessary to reach this issue because we find the order appealable on other grounds.

■ The scope of judicial review for an administrative agency decision was set forth in Gibson v. Civil Service Board, 285 Minn. 123, 171 N. W. 2d 712 (1969). In that case, this court found that a court should not interfere with an agency decision unless it has exceeded its jurisdiction, it has proceeded on an erroneous theory of law, its actions were arbitrary or unreasonable, or there is no substantial evidence to support the decision. See also, Minneapolis Van & Warehouse Co. v. St. Paul Terminal Warehouse Co. 288 Minn. 294, 180 N. W. 2d 175 (1970), and Quinn Distributing Co. Inc. v. Quast Transfer, Inc. 288 Minn. 442, 181 N. W. 2d 696 (1970).

Plaintiffs argue that Minn. St. 1974, § 116D.04, subd. 3, sets forth a standard of review for petitions requesting an EIS that is different from the standard for EQC-initiated review under Minn. St. 116D.04, subd. 1. Subd. 1 states:

"Where there is potential for significant environmental effects resulting from any major governmental action or from any major private action of more than local significance, such action shall be preceded by a detailed statement * * *."

Minn. St. 1974, § 116D.04, subd. 3, states:

"Upon the filing with the council of a petition of not less than 500 persons requesting an environmental impact statement on a particular action, the council shall review the petition and, where there is material evidence of the need for an environmental review, require the preparation of an environmental impact statement in accordance with provisions of this section."

Plaintiffs contend that the different language of the two subdivisions implies that the sections were intended to have different meaning and that to require all petitions under subd. 3 to meet the standard set forth in subd. 1 would strip subd. 3 of any meaning. AMAX, on the other hand, contends that all subdivisions of Minn. St. 116D.04 refer to subd. 1 and that subd. 3 is similar in purpose to subd. 8. Subd. 8 states:

"In order to facilitate coordination of environmental decision making and the timely review of agency decisions, the council shall establish by regulation a procedure for early notice to the council and the public of natural resource management and development permit applications and other impending state actions having significant environmental effects."

Since neither § 116D.04, subd. 3, nor any other section of Minn. St. c. 116D defines the term "need for an environmental review," the implication is that the legislature intended that the interpretation of that term be within EQC's discretion. EQC has interpreted the "need for an environmental review" language in subd. 3 as synonymous with the language in subd. 1 requiring significant environmental effects resulting from any major governmental or private action of more than local significance as a precondition for insisting on an EIS. Unless plaintiffs can show that the EQC's definition lacks a rational basis, this court must sustain that agency's interpretation.

Plaintiffs cite several cases in which other courts have noted the danger of permitting incremental construction in small segments which may thereby avoid environmental evaluation: Atchison, Topeka & Santa Fe Ry. Co. v. Callaway, 382 F. Supp. 610 (D. D. C. 1974); Society for Protection of New Hampshire Forests v. Brinegar, 381 F. Supp. 282 (D. N. H. 1974); People of Enewetak v. Laird, 353 F. Supp. 811 (D. Hawaii, 1973). The projects involved in those cases, however, differed from the AMAX project in that they were phases or parts of a larger project whereas this project involves an exploratory shaft in-

tended to ascertain mineral resources and whether there is to be any attempt at actual mining will be determined by the results of the exploratory project. The AMAX project constitutes a single project separate from actual copper-nickel mining. Although the exploratory shaft may be used later as a part of the mining operation, that fact is not determinative.

It should be noted that the EQC resolution of November 12, 1974, specifically stated:

"THAT this resolution shall not be construed as a commitment to copper/nickel development in the state and that any exploration project, such as the AMAX proposal, is undertaken at the risk of the proposer and does not obligate the state to approve any subsequent proposed mining development."

It is also significant that on October 8, 1974, the EQC resolved that—

"* * * the MEQC require any copper-nickel exploration program, which will include the taking of a bulk sample or the sinking of a shaft, to be preceded by a data collection program and a pre-operational monitoring program, as prescribed by the Department of Natural Resources and the Pollution Control Agency and approved by the MEQC, and an environmental assessment."

The adequacy of the monitoring conducted at the project has already been reviewed by several state agencies including the PCA, the Department of Natural Resources, and the EQC. EQC's statement of the facts, albeit a brief statement, is adequate for this court to determine that the facts furnish justifiable reason for the EQC's action. Bryan v. Community State Bank, 285 Minn. 226, 172 N. W. 2d 771 (1969).

We feel that EQC's action is reasonable because the continual monitoring by the several state agencies involved will supply a more accurate factual foundation than is currently available for the eventual EIS that will undoubtedly be required should mining operations prove feasible as a result of this test. We therefore

384

hold that EQC's action was not unreasonable, arbitrary, or capricious.

Affirmed.