In the Matter of the Petition of **NORTHERN STATES POWER COMPANY for Review of its 1999 All source Request for Proposals.**

No. A03–836.

Court of Appeals of Minnesota.

March 30, 2004.

Peter H. Grills, O'Neill, Grills, & O'Neill, P.L.P.P., St. Paul, MN, for relator Pimicikamak Cree Nation.

Mike Hatch, Attorney General, Cassandra Opperman O'Hern, Assistant Attorney General, Steve H. Alpert, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Public Utilities Commission.

Allison F. Eklund, Jacobson, Buffalo, Schoessler, & Magnuson, Ltd., St. Paul, MN, for respondent Nisichawayasiht Cree Nation.

Eric F. Swanson, Winthrop & Weinstine, P.A., Minneapolis, MN, for respondent Manitoba Hydro.

Timothy R. Thornton and Michael C. Krikava, Briggs and Morgan, P.A., Minneapolis, MN, for respondent Northern States Power Company d/b/a Xcel Energy.

Mark A. Hallberg, Hallberg & McClain, St. Paul, MN; and Douglas J. MacKenzie (pro hac vice), Campbell & Marr, Winnipeg, Manitoba, Canada, for respondent Split Lake Cree Nation.

Considered and decided by KLAPHAKE, Presiding Judge, RANDALL, Judge, and FORSBERG, Judge.*

## OPINION

RANDALL, Judge.

This certiorari appeal arises out of decisions made by the Minnesota Public Utilities Commission to approve Manitoba Hydro as a future electricity resource and to approve a power-purchase agreement between Xcel Energy and Manitoba Hydro. Relator argues that the commission erred in (1) denying its request for a contested case hearing, and (2) failing to adequately consider the environmental and socioeconomic costs associated with the Manitoba Hydro Project. We affirm.

## FACTS

Manitoba Hydro is a Crown (Canadian) Corporation owned by the Province of Manitoba, with capital assets in service exceeding $7 billion, making it the fourth largest electrical utility in Canada. Manitoba Hydro has engaged in energy trading with Minnesota utilities since 1970, and has electricity-trading partnerships with several Minnesota utilities, including Xcel Energy, Minnesota Power, Great River Energy, Otter Tail Power Company, and MinnKota Power Cooperative. Virtually all of Manitoba Hydro's existing generation is hydroelectric, consisting of a system of dams, reservoirs and electric generation facilities

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI § 10.

that were built in connection with the Manitoba Hydro Project.

Construction of the Manitoba Hydro Project (the Project), also known as the Churchill–Nelson Hydroelectric Project, began in the 1960's. This project was a joint undertaking by Canada, the province of Manitoba, and Manitoba Hydro, and constituted an enormous effort that contained three fundamental elements: (1) the Churchill River Diversion; (2) the Lake Winnipeg Regulation; and (3) a series of generating stations on the Nelson River.[1] As part of the Churchill River Diversion, the Churchill River was dammed at the eastern outlet of Southern Indian Lake, which is part of the Churchill River system. The Missi Falls Controls Structure raised the level of Southern Indian Lake by approximately three meters, causing the lake to over flow southward through a man-made channel into the Rat–Burntwood Rivers system, which empties into the Nelson River. Because roughly 75% of the flow of the Churchill River was diverted into the Nelson River, generating stations could be installed on one river (the Nelson River) rather than two rivers.

The second element, the Lake Winnipeg Regulation, controls the water level of Lake Winnipeg, the eleventh largest freshwater lake in the world. Because the Nelson River drains Lake Winnipeg, the Jenpeg Control Structure was built on the Nelson River near the northern outlet of the lake to hold back water in the lake during spring and summer months when flows are naturally at their highest. The Jenpeg Control Structure then releases water into the Nelson River in winter months when electricity demand is the greatest. The effect of this process is to make Lake Winnipeg function as a huge storage reservoir. Additionally, channels were constructed to bypass shallow and narrow passageways in the water system to double the potential flow from Lake Winnipeg into the Nelson River.

Finally, the third element consists of five major dams that have been built on the Nelson River. With a combined capacity of 3830 megawatts, these dams generate three quarters of the electricity produced in Manitoba. A twin set of transmission lines, approximately 900 kilometers in length, deliver power from the Nelson River to southern Manitoba. All elements are located within the boundaries of Canada.

Since the inception of the Manitoba Hydro Project in the 1960's, there have been concerns regarding the environmental and socioeconomic consequences the project has had on the surrounding ecosystem. To help alleviate these concerns, the Northern Flood Agreement was signed in 1977. The Northern Flood Agreement (NFA) is an agreement between Manitoba Hydro, the Province of Manitoba, the Government of Canada (collectively known as the "Crown Parties") and five Cree Nations, including Cross Lake Cree Nation, now known as Pimicikamak Cree Nation (relator).[2] Pursuant to the NFA, the Crown Parties are to provide mitigation and compensation to the Cree Nations for adverse effects of the Manitoba Hydro hydroelectric operations, including socioeconomic effects. Because of the uncertainty of these impacts, both at the time of the initial construction of the hydroelectric facilities and into the future, the NFA recognized that it was not possible to foresee all

1. The Churchill and Nelson Rivers are large rivers that flow in a roughly parallel direction from west to east, and empty into the Hudson Bay in northern Manitoba.

2. The other four Cree Nations include: respondent Split Lake Cree Nation, respondent Nisichawaysihk Cree Nation, York Factory (Cree tribe) and Norway House (Cree tribe).

of the impacts or who might be impacted. Thus, the NFA established an arbitration process and fully empowered the Arbitrator "to fashion a just and appropriate remedy." NFA, paragraph 24.6, spells out the dispute-resolution process and is a 27–year–old source of relief for relator.

Unrelated to the NFA, Minn.Stat. § 216B.2422 (2002) and Minn. R. Ch. 7843 require that Minnesota electric utilities file resource plans every two years identifying the sources of electricity that will be used to serve electric customers. In January 1998, Xcel Energy filed its resource plan that forecasted that the demand for electricity would increase by 1.7% per year between 1998 and 2012, creating a need for an additional 1,207 to 3,031 megawatts of capacity by 2012. The resource plan stipulated that a portion of the increased demand would be met by acquiring some 2,400 megawatts of new generation that would be secured through competitive bidding.

Shortly after the resource plan was filed, Xcel Energy submitted a proposal to revise its competitive bidding process. By Order dated August 25, 1998, the Minnesota Public Utilities Commission (Commission) approved the five-step bidding process. Under the bidding process, interested bidders, including Manitoba Hydro, submitted proposals.

On April 6, 2000, Xcel Energy submitted its Final Evaluation Report to the Commission, announcing Manitoba Hydro as one of three bidders with which Xcel Energy would negotiate power purchase agreements (PPA). Shortly thereafter, various parties including relator urged the Commission to investigate certain issues related to the Manitoba Hydro bid prior to submission of a final PPA.[3] Respondents,

Manitoba Hydro, Xcel Energy, Nisichawayasihk Cree Nation, and Split Lake Cree Nation, all filed comments and/or participated in an all-day hearing held on November 30, 2000. At this hearing, respondents recommended that the Commission approve the selection of Manitoba Hydro as a winning bidder, and allow the process to move forward to negotiation of a PPA and submission of that PPA to the Commission for a review and approval.

On February 7, 2001, the Commission issued its Order rejecting requests for further investigation, approving the final bid selections, and opening the docket regarding externality values. In rejecting relator's request to examine further the alleged socioeconomic costs related to Manitoba Hydro's bid, the Commission stated that "proper consideration of the socioeconomic impacts of Manitoba Hydro's current bid does not alter [Xcel Energy's] selection of Manitoba Hydro." The Commission also deemed "the socioeconomic impacts of this generation to be adequately internalized by Manitoba Hydro pursuant to the December 16, 1988[NFA]." The Commission explained that the NFA provides the framework for its parties to address their grievances and obtain bargained-for compensation. Relator is a signatory to the NFA. Based on its analysis, the Commission concluded that Xcel Energy adequately considered the socioeconomic costs as required by Minn.Stat. § 216B.2422, subd. 3, and no further evaluation of Manitoba Hydro's bid was necessary.

After the Commission issued its February 7, 2001, Bid Selection Order, Xcel Energy negotiated the PPA with Manitoba Hydro. In September 2002, the PPA was

3. Relator is the *only* Cree Nation involved in the NFA that opposed Manitoba Hydro as the winning bidder. The other four Cree Nations are against relator and they support the Minnesota Public Utilities Commission.

submitted to the Commission for approval. Shortly thereafter, relator filed a petition requesting a contested case hearing regarding the Manitoba Hydro PPA.

A hearing was held before the Commission on December 19, 2002, to consider relator's request for a contested case hearing, and Xcel Energy's request for approval of the Manitoba Hydro PPA. By Order dated March 18, 2003, the Commission declined to reconsider its February 7, 2001 Order (finding a contested case hearing unnecessary). The Commission first concluded that relator's petition for a rehearing was untimely. Then, despite relator's untimely request for a rehearing, the Commission considered relator's position and determined that "the socioeconomic costs of the Manitoba Hydro Project have been adequately internalized by Manitoba Hydro, have been taken into account in this matter, and no further inquiry into the specifics of those costs need to be made."

The Commission also approved the Manitoba Hydro PPA. In reaching its conclusion, the Commission determined that the PPA is in the best interests of the Minnesota ratepayers. The Commission denied relator's request for a contested case hearing to "further explore" the extent of alleged socioeconomic impacts associated with the PPA. Relator argued that the Commission should impose meaningful conditions upon its approval of the PPA to ensure that Manitoba Hydro lived up to its promises under the NFA. The Commission refused to adopt the role requested by relator, stating that "[t]he NFA is a treaty under Canadian and international law and is governed and enforced by its terms under Canadian and international law."

On April 7, 2002, relator filed a petition for reconsideration and rehearing, requesting that the Commission either accept the specific monitoring and reporting requirements proposed by relator or reconsider

the decision to deny a contested case hearing in this matter. The Commission denied relator's request by Order dated June 2, 2003. This appeal followed.

## ISSUES

I. Did the Minnesota Public Utilities Commission err by denying relator's request for a contested case hearing in regard to the Commission's consideration of a Power Purchase Agreement between Xcel Energy and Manitoba Hydro?

II. Did the Commission fail to adequately consider the environmental and socioeconomic costs associated with the Manitoba Hydro Project?

## ANALYSIS

### I.

The standard of review of an agency decision denying a contested case hearing is governed by Minn.Stat. 14.69 (2002). This statute provides that a reversal is warranted only if the agencys decision is: (1) in violation of constitutional provisions, (2) in excess of the agencys statutory authority or jurisdiction, (3) made upon unlawful procedure, (4) affected by other error of law, (5) unsupported by substantial evidence, or (6) arbitrary or capricious. *Id.* Decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to agencies expertise and their special knowledge in the field of their technical training, education and experience. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). A reviewing court may not substitute its own judgment for that of an administrative agency when the finding is properly supported by the evidence. *Vicker v. Starkey*, 265 Minn. 464, 470, 122 N.W.2d 169, 173 (1963).

Relator argues that it is entitled to a contested case hearing to determine the socioeconomic and environmental effects of the Manitoba Hydro Project. The Minnesota Public Utilities Commissions rules provide that:

If a proceeding involves contested material facts and there is a right to a hearing under a statute or rule, or if the commission finds that all significant issues have not been resolved to its satisfaction, the commission shall refer the matter to the Office of Administrative Hearings for contested case proceedings.

Minn. R. 7829.1000. Thus, for relator to be entitled to a contested case hearing, relator must show that it is entitled to a contested case hearing under a statute or rule *and* that there are contested material facts.

### A. Entitlement to hearing under a statute or rule

▪ Relator contends that when viewing the contested case procedural safeguards contained in the Minnesota Administrative Procedure Act (APA) together with the environmental provisions of the integrated resource planning statute, a right to a contested hearing is created. The APA defines a contested case as a proceeding before an agency in which the legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing. Minn.Stat. 14.02, subd. 3 (2002). The APA contested case procedures state that [a]n agency shall initiate a contested case proceeding when one is required by law. Minn.Stat. 14.57(a) (2002). Thus, the APA itself provides no right to a contested case hearing, but only sets forth the procedures to be followed when another statute grants such a right. *Cable Commn. Bd. v. Nor–West Cable Commn. Pship.,* 356 N.W.2d 658, 665 (Minn.1984).

▪ Relator asserts that the statute under which the right to a contested case hearing is created is Minn.Stat. 216B.2422, subd. 3 (2002). This statute provides:

**Environmental costs.** (a) The commission shall, to the extent practicable, quantify a range of environmental costs associated with each method of electricity generation. A utility shall use the values established by the commission in conjunction with other external factors, including socioeconomic costs, when evaluating and selecting resource options in all proceedings before the commission, including resource plan and certificate of need proceedings.

(b) The commission shall establish interim environmental cost values associated with each method of electricity generation by March 1, 1994. These values expire on the date the commission establishes environmental cost values under paragraph (a).

Minn.Stat. 216B.2422, subd. 3.

There is nothing in the plain language of Minn.Stat. § 216B.2422, subd. 3, that provides for the right to a contested case hearing. Had the legislature intended to require a contested case hearing, it could have provided for one. *See In re Deregulation of Installation & Maintenance of Inside Wiring,* 420 N.W.2d 650, 655–56 (Minn.App.1988) (stating that since the legislature did not require a contested case hearing under the statute, the court could assume that a contested case hearing is not required in the case of a summary investigation by the Commission). The APA specifically states that there is no right to a contested case hearing unless another statute provides such a right. *See* Minn.Stat. § 14.57(a). Because the plain language of section 216B.2422, subd. 3, does not specifically provide for the right

to a contested case hearing, a hearing is not created under the statute.

Despite the lack of plain language requiring a contested case hearing, relator asserts that a right to a contested case hearing is created under Minn.Stat. 216B.2422 subd. 3(a), Minn. R. 7843.0500, subp. 3, claiming these provisions legally require the Commission to make specific findings of fact regarding the extent of uncompensated and unremediated environmental and socioeconomic costs of the Manitoba Hydro Project before approving the pending PPA. Because of the complexity of the factual determinations, relator contends that the only way for the Commission to fulfill this legal obligation is to hold a contested case hearing.

Section 216B.2422, subd. 3(a), states that [t]he commission *shall, to the extent practicable, quantify and establish a range of environmental costs* associated with each method of electricity generation. Minn.Stat. 216B.2422, subd. 3(a). But the statute goes on to state that it is the *utility* that shall use the values established by the commission in conjunction with other factors, including socioeconomic costs when evaluating and selecting resource options. *Id.* The plain language of the statute does not require the Commission to make *specific* findings regarding the extent of uncompensated and unremediated environmental and socioeconomic costs of a project.

Here, the Commission did establish a range of environmental effects pursuant to section 216B.2422, subd. 3(a). This was accomplished when the Commission considered the external costs, including socioeconomic costs in the evaluation of the Manitoba Hydro bid. The Commission confirmed that external costs had properly been taken into account when it reviewed Xcel Energys request that the Commission approve Xcel Energys selection of the Manitoba bid in its February 7, 2001 Order. This was the extent of the Commissions obligations under the statute. Under the statute, any further examinations of the effects regarding the extent of uncompensated and unremediated environmental and socioeconomic costs of the Manitoba Hydro Project were to be carried out by the utility, Xcel Energy. Accordingly, section 216B.2422, subd. 3(a), does not require the Commission to make specific findings of fact regarding the extent of uncompensated and unremediated environmental and socioeconomic costs of the Manitoba Hydro Project before approving the pending PPA.

Also, relators contention that Minn. R. 7843.0500, subp. 3, requires the commission to consider environmental and socioeconomic costs is misplaced. This section, entitled Commission Review of Resource Plans, provides:

Subp. 3. **Factors to consider.** In issuing its findings of fact and conclusions, the commission shall consider the characteristics of the available resource options and of the proposed plan as a whole. Resource options and resource plans must be evaluated on their ability to:

A. maintain or improve the adequacy and reliability of utility service;

B. keep the customers' bills and the utility's rates as low as practicable, given the regulatory and other constraints;

C. minimize adverse socioeconomic effects and adverse effects upon the environment;

D. enhance the utility's ability to respond to changes in the financial, social, and technological factors affecting its operations; and

E. limit the risk of adverse effects on the utility and its customers from

financial, social, and technological factors that the utility cannot control.

Minn. R. 7843.0500, subp. 3. Based on the plain language of the rule, Minn. R. 7843.0500, subp. 3, only applies to the Commissions consideration of Resource Plans. The proceeding from which this appeal stems relates to Xcels bid selections and PPAs implementing its bid selections, not its Resource Plans. Consequently, the Commission was not obligated to consider environmental and socioeconomic costs under Minn. R. 7843.0500, subp. 3, and relator is not entitled to a contested case hearing under Minn.Stat. 216B.2422, subd. 3(a), and Minn. R. 7843.0500, subp. 3.

Relator also contends that a contested case hearing may be implied, even though it is not specifically stated in an agency statute. In support of this argument, relator cites *Minn. Pub. Interest Research Group v. Minn. Envtl. Quality Council*, 306 Minn. 370, 237 N.W.2d 375 (Minn. 1975). In *Minn. Pub. Interest Research Group*, interested parties petitioned Minnesotas Environmental Quality Council (EQC) seeking preparation of an environmental impact statement in connection with the construction of an exploratory copper-nickel mine in northern Minnesota. The EQC denied the request, and the matter was appealed to the district court. The district court held that a contested case hearing was not required, and the matter was not subject to judicial review. On appeal to the Minnesota Supreme Court, the court determined that Minn. Stat. 116D.04, subd. 3, (1974) did not specifically state a right to a hearing regarding a petition. *Id.* at 379, 237 N.W.2d 375. But, the court concluded that a right to a

hearing regarding a petition was implied by the purpose of the act. *Id.*[4]

■ Although the court in *Minn. Pub. Interest Research Group* found an implied right to a hearing under section 116D.04, subd. 3, the statute at issue here is a completely different statute. There is no case law stating that section 216B.2422, subd. 3(a), implies a right to a contested hearing. In fact, this court has stated that when the legislature does not require a contested case hearing under a particular statute, the courts can assume that a contested case hearing is not required under the statute. *See In re Deregulation of Installation & Maintenance of Inside Wiring*, 420 N.W.2d at 655–56 (stating that since the legislature did not require a contested case hearing within Minn.Stat. 237.081, the court could assume that a contested case hearing was not required in the case of a summary investigation by the Commission).

Relator asserts that the Commission has acknowledged that the purpose of the integrated resource planning statute is to ensure that utilities give adequate considerations of factors whose public policy importance has grown in recent years, such as the environmental and socioeconomic impacts of different mixes. Thus, relator claims that a right to a contested case hearing must be implied to ensure that the purpose of the environmental review provisions of the integrated resource planning statute is accomplished.

In *In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility*, 421 N.W.2d 398, 405 (Minn.App.1988) *review denied* (Minn. May 18, 1988), the petitioners argued that the Environmental Rights Act and the Environmental Policy Act

---

**4.** Notably the court in *Minn. Pub. Interest Research Group,* did not actually order the agency to hold a contested case hearing because the court held that the hearing that had previously been provided to the aggrieved party by the agency was sufficient. *Minn. Pub. Interest Group,* 306 Minn. at 380, 237 N.W.2d at 381.

guaranteed them a right to a meaningful hearing which they claim they were denied. In support of their position, the petitioners cited the broad provisions in Minn.Stat. 116B.01 (1986) that grants all Minnesota citizens the right to the protection, preservation, and enhancement of air, water, land, and other natural resources located within the state. *Id.* The petitioners also cited the specific portion of that statute that provides it is in the public interest to provide an adequate civil remedy. *Id.* The court held that the environmental acts alone do not create the right to a contested case hearing, but it was through Minn. R. 7001.0130 that the right to a contested hearing is attained. *Id.*

Here, there is no implication that a contested case hearing is required to ensure that the purpose of the environmental review provisions of the integrated resource planning statute is accomplished. The mere existence of the statute does not create a right to a contested case hearing. *See id.* It is only through a specific statute or rule that a right to a contested case hearing arises. There is no statute or rule here providing for a right to a contested case hearing, and one cannot be implied.

Finally relator argues that the Minnesota Pollution Control Act (MPCA) Rules can help provide guidance when deciding whether to grant a contested case. Under the MPCA, an agency must grant a petition to hold a contested case hearing if it finds:

(A) there is a material issue of fact in dispute concerning the matter pending before the agency;

(B) the agency has the jurisdiction to make a determination on the disputed material issue of fact; and

(C) there is a reasonable basis underlying the disputed material issue of fact or facts such that holding of a contested case hearing would allow the introduction of information that would aid the agency in resolving the disputed facts in making a final decision on the matter.

Minn. R. 7000.1900, subp. 1. Relator asserts that because all three factors are satisfied here, a contested case hearing is appropriate.

We do not find a reason to refer to the MPCA for guidance. The MPUC has its own rule stipulating when a party has a right to a contested case hearing. *See* Minn. R. 7829.1000. Accordingly, we decline to turn to the MPCA for an implied right to a contested case hearing.

### B. Material facts

■ Minn. R. 7829.1000 provides that to be entitled to a contested case hearing, relator must show that there are contested material facts. The burden is on the relator, as the party requesting a contested case hearing, to demonstrate the existence of material facts that would aid the agency in making a decision. *In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility,* 421 N.W.2d at 404. There must be some showing that evidence can be produced that is contrary to the action proposed by the agency. *In re Amendment No. 4 to Air Emission Facility Permit No. 2021–85–OT–1,* 454 N.W.2d 427, 430 (Minn.1990).

■ Here, relator argues that its factual affidavits clearly demonstrate that there are material issues of fact in dispute. Relator asserts that the affidavits address the nature, character, and extent of environmental and socioeconomic harms that have been caused by the Manitoba Hydro Project. But, none of the parties involved in the case, including Xcel Energy and the Commission, disputed the proposition that power generation in Manitoba has caused

environmental and socioeconomic harm to relator. Thus, any issues concerning the environmental and socioeconomic damages caused by the Manitoba Hydro Project are not disputed material facts. *See In re N. States Power Co. Wilmarth Indust. Solid Waste Incinerator Ash Storage Facility,* 459 N.W.2d 922, 923 (Minn.1990) (holding that relator was not entitled to a contested case hearing because relator had not raised sufficient issues of material fact).

Relator also contends that the affidavits directly challenge the Commissions conclusion that the externalities have been internalized by the NFA, thus creating a material issue of fact. We disagree. Manitoba Hydro has a legal obligation under the NFA. The legal obligation under NFA is designed to fully address grievances and to internalize all impacts and costs causally related to the Manitoba Project. The Commission recognized Manitoba Hydros obligation under the NFA, and determined that because of the existence of the treaty, the question of whether relator had been fully compensated, or whether all the parties had abided by the NFA was immaterial to approving the PPA. Whether Manitoba Hydro breached its obligations to relator pursuant to the NFA is an issue beyond the jurisdiction of Minnesota state courts. Relators claim of a dispute between itself and Manitoba Hydro concerning the NFA does not raise a material dispute to be resolved by the Commission. A dispute under the treaty and NFA is appropriately decided under Canadian law. That avenue has been and is available to relator. For purposes of this appeal, relator has not shown any material facts in dispute.

Because there are no material facts in dispute, and because Minn.Stat. 216B.2422, subd. 3, does not provide for the right to a contested case hearing, relator has failed to satisfy both of the requirements neces-

sary for a contested case hearing as set forth in Minn. R. 7829.1000. The Commission could have granted relator a contested case hearing, but it was not error not to do so. Accordingly, we conclude that the Commission did not err by denying relators request for a contested case hearing.

**II.**

■ Relator argues that the Commission failed to adequately consider the environmental and socioeconomic costs associated with the Manitoba Hydro Project. We disagree. As stated in the above analysis, section 216B.2422, subd. 3(a), and rule 7843.0500, subp. 3, do not require the Commission to make specific findings of fact regarding the extent of uncompensated and unremediated environmental and socioeconomic costs of the Manitoba Hydro Project before approving the pending PPA. The Commission recognized this, and stated in its March 18, 2003 order that:

> In its February 7, 2001 Order, the Commission did not make, nor did it need to make, findings regarding the specific adverse affects of the Manitoba Hydro Project. Whatever those harms are, they are guaranteed to be paid and/or remedied under the NFA. In that sense, they have been adequately internalized by Manitoba Hydro, evaluated by Xcel and considered by the Commission.

To the extent that the Commission did consider the environmental and socioeconomic effects of the Manitoba Hydro Project, the considerations were adequate under the applicable law and circumstances of this case. The Commission recognized the existence of the NFA, which is intended to address the impacts of hydroelectric projects in Manitoba, both at the time of the initial construction and into the future. The NFA acknowledges that it is not possible to foresee all of the impacts or whom the Manitoba Project might impact.

Therefore it sets out programs and principles for compensation or mitigation of Project impacts.

Under the NFA, the Arbitrator has been given a number of plenary powers. Pursuant to Article 24.6, the Arbitrator is given broad authority and power to make awards capable of implementation and to fashion an appropriate remedy in respect of any and all adverse effects of the Project on any person ... The NFA further provides the Arbitrator with the power to make additional orders in respect to failure to comply with or give effect to any provisions of the NFA, the power to hear any claim and determine if it arises directly or indirectly out of the Project or arises by failure to comply with or give effect to any provisions of the NFA, gives the right to order interim compensation prior to determining any issue in totality, and gives the ability to hear any claim or matter before any actual damage has occurred.

It has to be pointed out that relators real agenda is not a contested case hearing because a hearing does not accomplish anything. What relator wants to accomplish is to hopefully block Xcel Energy from buying power. If that happens, the loss of that contract will put economic pressure on Manitoba Hydro to satisfy relators compensation issues, which, if settled, would then not interfere with Manitoba Hydro contracting with Excel Energy. In essence, this lawsuit by relator is a collateral end run around the NFA, which contains within its four corners relators remedies. Manitoba Hydro is a Canadian project, located in Canada, involving Canadian waters and Canadian Indian tribes. The project is approximately forty years old, contains a lengthy agreement detailing rights and obligations of all parties, and, as stated above, contains arbitration provisions carefully setting out the settlement of grievances. Nothing in this aforementioned enumeration involves Minnesota courts. We decline to become entangled in Canadian disputes. The environmental and socioeconomic impacts caused by the Manitoba Project are capable of being addressed under the NFA. It is possible there are merits to relators claims for compensation and for more attention to their needs. That issue is not before us. The Commissions conclusions were adequate on the issue it . had authority to decide.

## DECISION

A contested case hearing is not required by statute or rule. The Commission's denial of relator's request for a contested case hearing was not erroneous.

The power purchase agreement between Xcel Energy and Manitoba Hydro does not extend to an examination by a Minnesota agency or Minnesota courts of the 1977 Northern Flood Agreement involving Canadian entities, the government of Canada, and five Canadian Cree nations. Those issues are controlled by the arbitration provisions of the NFA.

**Affirmed.**