*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0438
A14-0439**

In the Matter of the Petition of Xcel Energy for
Approval of the Acquisition of 600 MW of Wind Generation,

and

In the Matter of the Petition of Xcel Energy for
Approval of the Acquisition of 150 MW of Wind Generation.

**Filed February 9, 2015
Affirmed
Bjorkman, Judge**

Minnesota Public Utilities Commission
File No. E-002/M-13-603

Charles N. Nauen, David J. Zoll, Kristen G. Marttila, Lockridge Grindal Nauen P.L.L.P., Minneapolis, Minnesota; and

Thomas Melone (pro hac vice), Minneapolis, Minnesota (for relators Garvin Wind, LLC, Gadwell Wind, LLC, Greenhead Wind, LLC, Watonwan Wind, LLC, Highwater Wind, LLC, Ecos Energy, LLC, Summit Wind, LLC, Jeffers South, LLC, and Hurricane Wind, LLC)

Michael C. Krikava, Thomas Erik Bailey, Anna E. Jenks, Briggs and Morgan, PA, Minneapolis, Minnesota; and

Kari L. Valley, Assistant General Counsel, Xcel Energy, Inc., Minneapolis, Minnesota (for respondent Northern States Power Company, d/b/a Xcel Energy, Inc.)

Lori Swanson, Attorney General, Elizabeth M. Jones, Anjali Shankar, Assistant Attorneys General, St. Paul, Minnesota (for respondent Minnesota Public Utilities Commission)

Sten-Erik Hoidal, Christina K. Brusven, Fredrikson & Byron, P.A., Minneapolis, Minnesota (for respondent Geronimo Wind, LLC d/b/a Geronimo Energy, LLC)

Considered and decided by Connolly, Presiding Judge; Halbrooks, Judge; and Bjorkman, Judge.

## UNPUBLISHED OPINION

**BJORKMAN**, Judge

Relators challenge respondent Minnesota Public Utilities Commission's approval of respondent Northern States Power Company d/b/a Xcel Energy's (Xcel) petitions to acquire wind-powered electricity, arguing that they were entitled to a contested-case hearing and that the commission's approval is inconsistent with Xcel's statutory obligation to make reasonable efforts to fulfill its renewable-energy requirements using community-based energy-development projects. We affirm.

## FACTS

Relators[1] are Minnesota-based wind-power companies, formed to develop community-based energy-development (C-BED) projects on land owned and farmed by member-owners. Relators' wind-power projects qualify for C-BED status under Minn. Stat. § 216B.1612 (2014), which was enacted to provide rural communities with the opportunity to share in the economic benefits of large energy-production projects.

In February 2013, Xcel solicited bids for up to 200 megawatts (MW) of wind power. This request for bids was precipitated in part by Xcel's need to acquire additional

---

[1] Relators include Ecos Energy, LLC, Summit Wind, LLC, Jeffers South, LLC, Greenhead Wind, LLC, Garvin Wind, LLC, Gadwall Wind, LLC, Watowan Wind, LLC, Hurricane Wind, LLC, and Highwater Wind, LLC, who jointly filed a petition to intervene in the wind-acquisition proceedings.

wind-generated electricity to comply with state renewable-energy standards. The standards require Xcel to produce 25% of its electricity from wind power by 2020. Minn. Stat. § 216B.1691, subd. 2a(b) (2014). Xcel must also submit a renewable-energy plan to the commission specifying how it will meet its renewable-energy requirements. *Id.*, subd. 10 (2014). The commission approved Xcel's current renewable-energy plan in 2009 after a public hearing.

Xcel received 57 bids for wind projects located in six states. Xcel initially screened the bids by calculating the levelized cost[2] of each project and setting a $29 per megawatt-hour (MWh) cutoff. Sixteen projects came in below the levelized-cost cutoff. Relators' C-BED projects were among the initial 57 bids, but none fell below the $29/MWh threshold. The closest C-BED bid was $29.55/MWh.

After further review, Xcel petitioned the commission to approve four projects, representing a total of 750 MW of wind power. Xcel believed this large acquisition was warranted due to its need to acquire significant wind resources to comply with the renewable-energy standards, and due to historically low prices. Relators successfully petitioned to intervene in the approval proceeding, and objected to the proposed acquisitions on the ground that Xcel did not make a reasonable effort to fulfill its wind-energy needs through C-BED projects. Relators also asked the commission to refer the matter to the Office of Administrative Hearings for a contested-case proceeding.

In December 2013, the commission approved Xcel's proposals, concluding that they represent a reasonable and prudent approach to meet Xcel's obligations under the

_____

[2] Levelized cost is the average cost of power calculated over the life of the investment.

state's renewable-energy standards. The commission rejected relators' request for a contested-case proceeding. Relators filed a petition for reconsideration, which the commission denied. Relators bring this certiorari appeal.

## DECISION

This court will affirm an administrative agency's decision unless its findings, inferences, conclusions, or decisions are:

> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or
> (e) unsupported by substantial evidence in view of the entire record as submitted; or
> (f) arbitrary or capricious.

Minn. Stat. § 14.69 (2014); *see* Minn. Stat. § 216B.52, subd. 1 (2014). A party challenging an agency's findings must establish that they are not supported by the record evidence. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977). If an agency engages in reasoned decision-making, we will affirm, even if we may have reached a different conclusion had we been the fact-finder. *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship*, 356 N.W.2d 658, 669 (Minn. 1984).

We presume that an agency's decision is correct, and defer to an agency's conclusions in its area of expertise. *Id.* at 668. An agency is also presumed to have the expertise necessary to decide technical matters within the scope of its authority, and deference is extended to any agency decision-maker "in the interpretation of statutes that the agency is charged with administering and enforcing." *In re Excess Surplus Status of*

4

*Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001). But when a decision turns on the meaning of words in a statute or regulation, a legal question is presented, and we are not bound by the agency's decision. *St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 39-40 (Minn. 1989).

On appeal, relators raise two primary arguments: (1) the commission improperly denied their request for a contested-case proceeding and (2) Xcel did not make a reasonable effort to meet its renewable-energy requirements through C-BED projects by affording them special considerations during the bidding process. We address each argument in turn.

## I.      Relators are not entitled to a contested-case proceeding.

A party is entitled to a contested-case proceeding before an agency where the "legal rights, duties, or privileges of specific parties are required by law or constitutional right to be determined after an agency hearing." Minn. Stat. § 14.02, subd. 3 (2014). The Minnesota Administrative Procedure Act does not provide a right to a contested-case proceeding but instead sets out the procedures to be followed when such a right exists. *Cable Commc'ns Bd.*, 356 N.W.2d at 665. These procedures include the right to present and examine witnesses and offer evidence before an administrative law judge. Minn. R. 1400.7800 (2013). The commission "shall" refer a matter to the Office of Administrative Hearings for a contested-case proceeding when the case "involves contested material facts and there is a right to a hearing under statute or rule." Minn. R. 7829.1000 (2013); *see also In re N. States Power Co.*, 676 N.W.2d 326, 332 (Minn. App. 2004).

Relators argue that a contested-case proceeding was warranted because there are disputed material facts and they are entitled to a contested-case proceeding under Minnesota's renewable-energy-standards statute, Minn. Stat. § 216B.1691 (2014). We disagree. First, relators fail to identify any contested material facts. The disputed facts relators cite relate to the impact of Xcel's plan to ultimately purchase two of the four proposed wind-power facilities. Xcel's long-term ownership plan is not material to whether the proposed projects will satisfy Xcel's obligations under the renewable-energy standards. Also, concerns regarding Xcel's proposed ownership plan are not material to how the competitive bidding process was conducted.

Second, relators do not cite a statute or administrative rule that entitles them to a contested-case proceeding. The renewable-energy-standards statute on which they rely only directs the commission to hold a public hearing to determine whether a public utility's proposed renewable-energy plan is in the public interest. Minn. Stat. § 216B.1691, subd. 10. This case does not involve a challenge to Xcel's renewable-energy plan. Rather, it involves the approval of four specific wind-power projects. And relators cannot point to any other statute or rule that entitles them to a contested-case proceeding in order to challenge a specific petition for approval of renewable-energy acquisitions. Accordingly, we conclude that relators are not entitled to a contested-case proceeding.

## II.     The commission properly approved Xcel's proposed wind-power acquisitions.

Relators contend that approval of Xcel's petitions did not conform with the law because Xcel's competitive bidding process focused primarily on cost-effectiveness, and

did not afford C-BED projects special consideration. Relators raise a variety of arguments as to why C-BED projects are entitled to preferential consideration, none of which we consider persuasive. We address each of these arguments in turn.

**A.** **The commission did not fail to consider whether Xcel's proposed wind-power projects would "maximize the benefit" to Minnesota citizens, as directed by Minn. Stat. § 216B.1691.**

Minnesota's renewable-energy-standards statute establishes a framework to ensure that utilities produce an increasing amount of electricity from renewable sources. Under the statute, Xcel is required to generate or procure 25% of its electricity from wind power by 2020. *Id.*, subd. 2a(b). The statute also directs the commission to take "all reasonable actions" to ensure that these standards are "implemented to maximize the benefits to Minnesota citizens." *Id.*, subd. 9. The commission must do this by

> balancing factors such as local ownership of or participation in energy production, development and ownership of eligible energy technology facilities by independent power producers, Minnesota utility ownership of eligible energy technology facilities, the costs of energy generation to satisfy the renewable standard, and the reliability of electric service to Minnesotans.

*Id.*

Relators argue that the commission failed to comply with this statutory requirement because it did not ensure that Xcel gave C-BED projects special consideration during the bidding process. We are not persuaded. As outlined above, the renewable-energy-standards statute directs the commission to balance a variety of potentially competing factors in order to maximize the benefit to citizens. Some of these enumerated factors, like local ownership of the energy producer, may weigh in relators'

7

favor.  Others, like the cost of energy production, do not.  The record indicates that Xcel's competitive-bidding process resulted in the selection of some of the most cost-effective bids.  While the commission's approval of Xcel's proposed wind projects and selection process may have weighed cost-effectiveness and reliability more heavily than ownership of the energy producers, the statute expressly permits the commission to do just that.

> **B. The selection of cost-effective, non-C-BED projects is consistent with Xcel's approved renewable-energy plan.**

Xcel must file a plan with the commission that sets out how they intend to meet the statutory renewable-energy requirements.  *Id.*, subd. 10.  The commission must approve the plan unless it finds after a public hearing and comment period that the plan is not in the public interest.  *Id.*  The commission's review must consider the plan's allocation of projects among C-BED, non-C-BED, and utility-owned projects, while also balancing the state's interest in

> (1) promoting the policy of economic development in rural areas through the development of renewable energy projects, as expressed in subdivision 9;
> (2) maintaining the reliability of the state's electric power grid; and
> (3) minimizing cost impacts on ratepayers.

*Id.*

Xcel's 2009 renewable-energy plan outlined an intent to procure equal proportions of renewable energy from C-BED, non-C-BED, and utility-owned power sources.  The commission approved the plan, but expressed concern that the proposed allocation could lead Xcel to select projects based on ownership structure, rather than cost-effectiveness.

8

To address this concern, the commission explicitly directed Xcel to use a "competitive bidding process" when acquiring renewable-energy sources and to "evaluate all potential resources on an equivalent basis, regardless of the resources' ownership structures." The commission also stated that "Xcel must be able to demonstrate to the Commission's satisfaction that Xcel selected the most cost-effective resource options in order to recover the costs of its resource options from ratepayers." These aspects of the commission's order have never been challenged.

Consistent with the commission's direction, Xcel selected the four wind-power projects at issue here through a competitive bidding process that focused on cost-effectiveness. Relators' argument that their C-BED status entitles them to a bidding preference is at odds with the commission's clear directive not to select projects solely based on the producer's ownership structure.

Relators also assert that with the addition of these four projects, C-BED producers would supply only 8% of Xcel's wind power, a "far cry" from the one-third Xcel contemplated in its 2009 renewable-energy plan. According to relators, permitting Xcel to deviate so substantially from its target allocation constitutes an improper, de facto modification of Xcel's renewable-energy plan. We disagree. Relators cite no authority for this proposition. And their argument ignores clear language in the commission's order approving the plan stating that Xcel's ownership-allocation goal is "merely a target" that "will change as conditions warrant." On this record, we conclude that the commission's approval of the four wind-power projects is consistent with Xcel's renewable-energy plan.

**C.** **Minnesota's C-BED statute does not require Xcel to choose C-BED projects over lower cost, non-C-BED alternatives.**

Relators argue that the C-BED statute, Minn. Stat. § 216B.1612, entitles C-BED projects to preferential consideration, even if the bids for those projects are not cost-competitive with non-C-BED bids. Specifically, relators note that when Xcel acquires new renewable-energy resources:

> [Xcel] must take reasonable steps to determine if one or more C-BED projects are available that meet the utility's cost and reliability requirements, applying standard reliability criteria, to fulfill some or all of the identified need at minimal impact to customer rates.

Minn. Stat. § 216B.1612, subd. 5(a). Relators assert that Xcel did not comply with the statute because it forced them to compete on a cost basis with all other bids. We disagree. The plain language of the C-BED statute directs Xcel to seek out C-BED projects that "meet the utility's cost and reliability requirements," and have "minimal impact on customer rates." In other words, the C-BED statute requires Xcel to solicit C-BED projects that conform with cost, reliability, and customer-rate requirements. Accordingly, it was reasonable for Xcel to utilize an open bidding process that sought participation by C-BED projects, while also requiring that those projects meet a price threshold to qualify for final consideration.

**D.** **Xcel's C-BED tariff does not require it to give special consideration to C-BED projects.**

Utilities like Xcel must obtain the commission's approval of rate schedules for C-BED projects (tariff). *Id.*, subds. 3, 4. Relators argue that the existence of this tariff entitles them to a bidding preference. We are not persuaded. The C-BED statute's tariff

10

provisions prescribe the rates paid to C-BED project owners, but they also state that "[n]othing in this section shall be construed to obligate a utility to enter into a power purchase agreement under a C-BED tariff developed under this section." *Id.*, subd. 5(a). Relators' contention that they are entitled to a bidding preference is inconsistent with this language.

Relators also argue that because Xcel's tariff is based, in part, on rates incurred in connection with its recent C-BED projects, Xcel is obligated to select relators' bids without regard to how they compare with the current non-C-BED bids. This misconstrues Xcel's C-BED tariff. The tariff states that Xcel "shall pay the [C-BED] developer according to a rate schedule such that the payments over the 20-year life of the agreement compares reasonably to the ranges of prices obtained in recent solicitations and executed power purchase agreements." This provision only addresses the rates Xcel pays to C-BED owners, not how Xcel solicits and selects projects. Furthermore, the notion that Xcel should give priority to C-BED projects that are not competitive with current bids is contrary to the commission's instructions to select cost-effective projects with minimal customer impact.

**E.     Relators have not demonstrated that Xcel's competitive bidding process improperly excluded C-BED projects.**

Finally, relators argue that Xcel's emphasis on cost-effectiveness and use of a $29/MWh threshold improperly prevented Xcel from considering C-BED bids. We disagree. Xcel initially calculated the levelized cost of all 57 bids in order to assess long-term cost implications and determine whether to proceed with the bidding process at all.

11

These levelized cost estimates were derived from data included in the bids and revealed historically attractive pricing. Only after examining the distribution of levelized costs did Xcel choose to focus its review on bids that came in at or below $29/MWh. This price threshold uniformly applied to all project bidders, regardless of their ownership structure. And it allowed Xcel to efficiently hone in on the 16 most cost-effective bids, consistent with the commission's instruction to select cost-competitive projects.

Xcel's subsequent review of the 16 remaining bids included multiple rounds of due diligence and negotiations, during which Xcel assessed a variety of factors related to project feasibility and ratepayer impact. Even if the lowest C-BED bid had not been excluded from this final consideration by the $29/MWh threshold, the record indicates that it was not otherwise competitive with the bids Xcel ultimately selected. The commission highlighted this fact in its order approving the petitions, stating "the relevant basis of comparison is not $29.00/MWh but the trade-secret levelized costs of energy generated by the four proposal projects. This data reveals that the C-BED proposals were simply not competitive."

The record also demonstrates that relators had full access to the bidding process. Xcel advertised its request for bids through "a variety of mediums, including trade press and industry-related websites." These solicitations were directed at various ownership structures, including C-BED projects. The bidding process was reviewed by an independent auditor and by the Minnesota Department of Commerce. Both independent entities approved Xcel's process and selections.

12

On this record, we conclude that there was a sufficient basis for the commission to find that Xcel implemented a fair and competitive bidding process that afforded relators a reasonable opportunity to compete for Xcel's business. Relators may be disappointed by the outcome of that process, but there is no basis to conclude that C-BED projects were entitled to special consideration or that they were improperly prevented from participating in the open, competitive process.

**Affirmed.**